(No. 59446.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT ST. PIERRE, Appellant.

*Opinion filed March 30, 1988.*

Daniel D. Yuhas, Deputy Defender, of the Office of the State Appellate Defender, of Springfield (Allen H. Andrews and Jonathan C. Haile, Assistant Defenders, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Roma Jones Stewart, Solicitor General, and Terence M. Madsen, Assistant Attorney General, of Chicago, and Thomas V. Gainer, Jr., Kevin Sweeney and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Robert St. Pierre, Jackie Gibons and Barry Wilson were found guilty of the murders of Benjamin and Sybil Gibons (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)), of two counts of conspiracy to commit murder (Ill. Rev. Stat. 1981, ch. 38, par. 8—2(a)), of two counts of armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2) and of two counts of concealing a homicidal death (Ill. Rev. Stat. 1981, ch. 38, par. 9—3.1). After the State announced its decision to seek the death penalty, the defendant's sentencing hearing was severed from that of his codefendants, who waived a jury hearing for sentencing. The jury found that there existed one or more of the aggravating factors set out in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)), and that there were no mitigating factors sufficient to preclude a sentence of

death. The trial court then sentenced the defendant to death and to two consecutive 60-year extended prison terms on the armed robbery convictions; two concurrent 7-year terms on the conspiracy convictions; and two concurrent 5-year terms on the convictions for concealment of a homicidal death. The defendant's sentence of death was stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

Detective Greg McLaughlin of the Skokie police department testified at the trial that on July 27, 1982, he was summoned to the residence of Benjamin and Sybil Gibons at 9151 N. Karlov, Skokie, in the course of a burglary investigation. He spoke with Mr. and Mrs. Gibons and their daughter Jackie, who told McLaughlin that earlier that day Barry Wilson had telephoned her at work and said that in attempting to enter her home, he had broken a window. He asked her to clean up the broken glass before her parents discovered it. At the end of their discussion, McLaughlin made arrangements for Mr. Gibons to sign a complaint against Wilson the next day at the Skokie police station. When he failed to appear, McLaughlin placed a call to the Gibonses' residence on July 29, at approximately 7 p.m. Jackie answered and told McLaughlin that her father was not home, but that she would have her father call him when he returned. Not having heard from Mr. Gibons, McLaughlin called the Gibonses' residence again on July 31 and talked to Jackie. She said that her mother and father were out to dinner and that she would inform her father of his call.

At approximately 2:45 p.m. on August 2, Detective McLaughlin went to the Gibonses' residence after a call from Mrs. Gibons' sister, Harriet Metrick. Metrick had called the police after the Gibonses' employers informed her that they had not been to work in several days. Inside the residence, McLaughlin observed bloodstains in

several rooms of the house and cleaning fluids and blood-soaked rags and towels scattered about. In the kitchen he found a bloody pair of gloves and Benjamin Gibons' wallet. Holes had been cut in the living-room carpet, and in the master bedroom a large hole was discovered in the closet wall which led to the garage. McLaughlin also found a belt in the master bedroom which bore the defendant's name and what was shown to be his prison identification number. (The defendant had been released from prison about three weeks prior to the crimes considered here.) In the basement were more bloody towels and sheets, as well as a pair of blood-soaked gloves. An inspection of the garage revealed garbage bags containing bloodstained sections of carpeting and towels, a hammer covered with masonry dust and a bloodstained newspaper, dated July 29, 1982.

On August 3, Jackie Gibons, who was then 20 years of age, contacted the police and volunteered to give a statement detailing the events leading to her parents' death. In the presence of Detective McLaughlin and Assistant State's Attorney Al Tomaso, she stated that on July 29, 1982, the defendant, Robert St. Pierre, bludgeoned her parents to death at their home under an agreement and plan made by the defendant, Barry Wilson and her. Jackie also stated that Wilson was in Los Angeles, California, with the Gibonses' automobile, and that he was probably with a man named Craig Rawlins. At trial, Gibons' statement was read to the jury with a limiting instruction that the statement was not to be considered against the defendant or Wilson. See *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.

McLaughlin testified that he then traced Wilson and Rawlins to Rawlins' father's home in Phoenix, Arizona. On August 5, 1982, he and Sergeant O'Keefe, also of the Skokie police department, flew to Phoenix, where Wilson

and Rawlins were held in custody and the Gibonses' car was impounded. McLaughlin examined the Gibonses' car, and in the trunk he discovered a shovel, an attache case containing surgical bandages, a can of Lysol and bloodstains under the carpeting. McLaughlin also spoke with Rawlins, who told him that while he and Wilson were in Phoenix, Wilson told him that the defendant had killed the Gibonses with a hammer and that Wilson had dropped the bodies off near Albuquerque, New Mexico. Subsequently, the officers returned to Chicago with Wilson. O'Keefe testified that during the flight, Wilson told him that the defendant had killed the Gibonses, but that he (Wilson) was not present during the murders. Later, Wilson recanted his statement, admitting to being present at the time Mrs. Gibons was murdered. At trial the court instructed the jury that the statements of Wilson were to be considered only against him.

On August 3, 1982, the defendant was arrested and taken to the Skokie police station, where he gave an oral and a written statement to Assistant State's Attorney James Lieberman admitting the acts that led to the death of the victims. According to his statement, on July 27, 1982, Wilson told him that Jackie Gibons wanted her parents murdered and that it would "pay good money" if he would do it. Wilson mentioned a figure of $10,000. After their conversation they went to the Gibonses' residence on Karlov where, in a bizarre action, considering the circumstances, Wilson broke through a window, entered the home and took some bologna and cheese from the refrigerator.

On July 29, Wilson and the defendant met Jackie in an alley where they "planned" the murders. The defendant stated that he wanted to "hear [Jackie] say *** that she wanted it to go down." The defendant described Jackie's response: "[Y]eah, she wanted it done." The defendant then suggested they use a blackjack but Wil-

son disagreed and told him to use a hammer. Jackie went back to work, and the defendant and Wilson picked up a 12-pack of beer. After drinking the beer, they went to a bar and had a couple of more drinks before taking a train to Skokie. At a restaurant a couple of blocks from the Gibonses' residence, Wilson gave the defendant a phone number where he could be reached before the defendant left for the Gibonses.

When he arrived, the defendant's statement read, Jackie let him in and introduced the defendant to her father, Benjamin Gibons. After Gibons walked into the kitchen, Jackie gave the defendant a hammer and he followed Gibons into the kitchen. There he confronted Gibons and repeatedly struck him about the head with the hammer until he stopped breathing. He then handed Jackie the phone number he had obtained from Wilson and told her to call him. Wilson arrived five minutes later, and for the next hour they attempted to clean up the spattered blood in the kitchen using rags and towels. They tied the body with tape and rope, wrapped it in plastic and a blanket, and placed it in the master bedroom. The defendant stated that before they moved the body he reached into the pocket of Mr. Gibons' trousers and took out his wallet, which contained many $20 bills. He kept a $20 bill and gave the wallet to Wilson.

Mrs. Gibons phoned her home and told Jackie that she wanted to be picked up at the train station. Jackie left in the family car, and in the meantime, Wilson and the defendant continued drinking. When Jackie and her mother arrived, the defendant was waiting in the hallway. As Mrs. Gibons walked through the front door, defendant struck her a number of times on the head with a hammer. The defendant said that Mrs. Gibons' last words were to Jackie, asking, "[H]ow could you do this to me?" They then tied the body with tape and rope, wrapped it in a blanket and plastic, and placed it in the

master bedroom. The defendant stated that due to the amount of blood that had soaked into the living-room carpeting, they cut out the stained section of carpeting and placed it in a trash bag. The defendant, Wilson and Jackie then took the Gibonses' car and went for a "cruise" with Wilson driving. He dropped the defendant and Jackie off at a hotel and left.

The next evening they returned to the Gibonses' residence. The defendant and Wilson broke through the wall in the bedroom closet that led to the garage and the bodies were passed through and placed in the trunk of the car. The defendant stated that at this time he observed that the tip of one of Mrs. Gibons' fingers was missing. He said that either Wilson or Jackie must have cut the finger in order to remove her wedding ring. They took the Gibonses' family car, and Wilson dropped the defendant off at a gas station and told him that he would be back at 10 p.m. He also told the defendant that when he returned they would drive to Arkansas to dispose of the bodies. Wilson, however, never returned and the defendant went home. Detective McLaughlin testified to the oral statement the defendant had made, and the defendant's written statement was read to the jury as part of the State's case in chief.

On August 10, 1982, the bodies of Benjamin and Sybil Gibons were found in a remote area near Albuquerque, New Mexico. The bodies were wrapped in blankets and plastic and tied with rope and tape. Patricia McFelley, a forensic pathologist, testified that she performed an autopsy on each body and that both exhibited several skull fractures and torso injuries. She also stated that the end of one of the fingers on the body of Mrs. Gibons was missing, although she could not determine whether its absence was the result of injury or decomposition. In her opinion, the cause of death resulted from multiple blunt trauma injuries to the head and thorax. Dr. J.

Stanley Rhine, a forensic anthropologist, testified that he examined the bodies and discovered that both exhibited several skull fractures that were large and circular. He stated that the type of instrumentality that would have been used to result in those types of injuries was consistent with blows by a hammer.

In addition to giving a statement to the police, Jackie Gibons was a witness at trial. She testified that in early 1982, Barry Wilson began to complain that he was frustrated and upset with her parents because they had taken away her bank books and charge cards so that she could not provide him with money. At one point, Wilson told her that he wanted them killed and that he had bought a gun and "knockout drops." On July 27, 1982, Wilson called Jackie at work and told her that earlier that day he was at her home, and that in attempting to enter, he had fallen through a window. He asked her to clean up the broken glass before her parents came home. Jackie then called her mother at work and told her of the incident. Mrs. Gibons called the police, and in response to her call, Detective McLaughlin came to the Gibonses' residence that evening. The next day Wilson again called Jackie at work. She told him that her parents were thinking of pressing charges against him, whereupon Wilson stated that they, Jackie's parents, were "going down tonight." On July 29, Jackie met Wilson and the defendant in an alley in downtown Chicago. Wilson told her that the defendant would kill her parents for $300 and that the defendant would come to the house at 6 p.m. that night.

That evening, at approximately 6:30 p.m., while Jackie was at home alone with her father, the defendant arrived. She let him in and introduced him to her father. She testified that after "chatting" awhile, Mr. Gibons walked into the kitchen and the defendant picked up a hammer and followed him. The defendant emerged from

the kitchen a few minutes later and said, "[H]e's fighting, he's not dead." He handed Jackie a matchbook with a phone number on it, instructed her to call Wilson, and then returned to the kitchen. Wilson arrived several minutes later and helped the defendant and Jackie clean up the kitchen, which was "covered with blood." She testified that she put the bloody rags and towels in garbage bags while the defendant and Wilson wrapped her now dead father's body in sheets and a blanket before placing it in the master bedroom. As they were cleaning up, Wilson gave Jackie her father's wallet. She removed the credit cards and left it in the kitchen.

Jackie told the jury that at approximately 7 p.m., Detective McLaughlin telephoned and asked to speak to her father. Jackie told him that he was not home, but that she would have her father return his call. Mrs. Gibons telephoned 10 minutes later and asked Jackie to pick her up at the train station. Before doing so, however, she, Wilson and the defendant took the family car and drove to the hardware store, where Wilson purchased plastic bags and sheets and a roll of tape. They also stopped at the liquor store to buy liquor before Jackie dropped the defendant and Wilson off at her house and went to pick up her mother at the train station. When they arrived, Jackie let her mother enter the front door first. As she walked through, Jackie saw the defendant strike her mother with a hammer. She then ran into the bedroom and stayed there until Wilson came in and told her to help them clean up. They wrapped the body in a blanket and sheets of plastic and carried it into the master bedroom.

At approximately 9 p.m., they left in the family car. Wilson dropped the defendant and Jackie off at a hotel where he registered a room for them. After he departed, the defendant told Jackie that "I did this all for you, I can't believe I did it, it's done."

The next day, she testified that the defendant, Wilson and she went back to the Gibonses' residence, where the defendant and Wilson broke a hole through the bedroom closet wall that led to the garage. The bodies were passed through the hole and placed in the trunk of the Gibonses' car. Wilson then dropped the defendant and Jackie off, telling them that he was driving to Arkansas to dispose of the bodies.

At the close of the trial, the defendant, Jackie Gibons and Barry Wilson were each convicted on two counts of murder, conspiracy to commit murder, concealment of a homicidal death, and armed robbery. After the State announced that it would seek the death penalty against all three defendants, Wilson and Gibons waived sentencing by the jury and their hearing was severed from that of the defendant. The jury found that the defendant was subject to the death penalty, being 19 years of age at the time of the murders, and that there existed three statutory aggravating factors: (1) the defendant had been convicted of murdering two or more individuals (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3)); (2) the defendant committed the murders pursuant to a contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(5)); and (3) the defendant killed the victims in the course of a felony, to wit, armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)). The jury also found that there were no mitigating factors sufficient to preclude the imposition of the death penalty; whereupon, as has been stated above, the trial court sentenced the defendant to death. At a separate sentencing hearing, the court sentenced the defendant to two consecutive 60-year extended prison terms on the armed robbery convictions; two concurrent 7-year terms on the conspiracy convictions; and two concurrent 5-year terms on the convictions for concealment of a

homicidal death. The defendant's death sentence was stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

The defendant argues that his conviction should be reversed and a new trial ordered on the ground that the trial court erred in failing to suppress inculpatory statements he made at the Skokie police station following his arrest. Evidence at the suppression hearing showed that the defendant was arrested at his mother's apartment at approximately 7 a.m. on August 3, 1982. The arresting officers found the defendant asleep on a couch and placed him against a wall. While one of the officers held a gun to his head, another read him his *Miranda* rights. The defendant testified that it was difficult to hear the officer because the officer was walking around the house while reciting the litany of rights and three other officers were asking him questions at the same time. The defendant was then transported to the Skokie police station, where he was brought to an interviewing room and handcuffed to a chair. The defendant testified that one of the arresting officers entered the room with a belt in his hand and slammed it on the table. He asked the defendant if he had ever seen it before, but the defendant did not say anything.

An assistant State's Attorney then entered the room and, according to the defendant, questioned him. A court reporter was brought in and the following colloquy took place:

"Q. [By Assistant State's Attorney Leiberman] Robert, I'll call you Bobbie, all right?

A. [By Robert St. Pierre] Yeah.

Q. Bobbie, I want to tell you that you have the right to remain silent. Do you understand that right?

A. Yes.

Q. You understand that anything you say can and will be used against you in a court of law?

A. Yes.

Q. Do you understand that you have a right to talk to a lawyer and have him present with you before and while you are being questioned?

A. Yes.

Q. Do you understand that if you cannot afford to hire a lawyer, one will be appointed by the court to represent you before any questioning?

A. Yes.

Q. Do you wish one?

A. Yes.

Q. Would you like to speak to a lawyer now?

A. No, no, after, that comes after, right?

Q. You could have a lawyer if you want one.

A. No, that's okay.

Q. So you prefer to talk to us now, today, without a lawyer being present?

A. Yes.

Q. Do you understand each of the above rights I have just read to you?

A. Yes.

Q. You want to make a statement to us today about what happened over at 9151 Karlov?

A. No.

Q. No, you don't want to talk to us?

A. Oh, yeah, I want to tell you about it, you know.

Q. Understanding each of these rights, do you want to talk to us now?

A. Yes.

Q. Why don't you tell me what happened from the very beginning?

A. Well, I met Barry in a bar with Sandy and we talked.

Q. Before we go any further, there seems to be a little confusion as to a couple of your rights. I think it's best that we go over them again. Do you understand that you have a right to have a lawyer with you and to talk to you before we have this interview, and you have the right

to have him present during this interview. Do you understand that?

A. I can have him here, and he can help me out?

Q. It's your choice.

A. Yeah.

Q. Do you understand that? Do you want to have one here now?

A. Yes.

Q. Does that mean you do not want to give a statement without a lawyer being here? Are you confused as to that?

A. Yeah. I don't know what you guys want.

Q. It's whatever you want to tell us, whatever you want to do. Do you want to give a statement today?

A. Oh, yeah, today.

Q. Supposedly there is no lawyer in the room with us. If you want, you can have a lawyer here with you, your own lawyer that can talk to you about anything you might want to talk to us about. Do you understand that?

A. Yeah.

Q. Do you want to have a lawyer in the room here today when you make a statement, or do you prefer to make a statement now without a lawyer?

A. Which is quicker?

Q. It would be quicker if you gave a statement now, but, however, if you want a lawyer, we will wait and get a lawyer for you.

A. No, no. I do not want a lawyer.

Q. I just want to make it clear. You know you have a right to have an attorney present with you?

A. Yeah.

Q. Do you understand all of those rights I have advised you of?

A. Yes."

The defendant then gave a statement admitting the acts which led to the deaths of the victims. Prior to trial, the defendant moved to suppress the statements on the ground that they were elicited in violation of his right under the fifth and fourteenth amendments to the Con-

stitution of the United States to have counsel present during custodial interrogation. (*Miranda v. Arizona* (1966), 384 U.S. 436, 473, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627.) The trial court, after a hearing, denied the motion, stating that the defendant indicated that he understood his right to have counsel present and that his decision to talk constituted a voluntary waiver of that right.

In *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the Supreme Court of the United States established procedural safeguards to protect the constitutional rights of persons subject to interrogation in "custodial surroundings." (383 U.S. at 467, 16 L. Ed. 2d at 719, 86 S. Ct. at 1624.) "To this end, the Miranda Court adopted prophylactic rules designed to insulate the exercise of Fifth Amendment rights from the government 'compulsion, subtle or otherwise,' that 'operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.'" (*Connecticut v. Barrett* (1987), 479 U.S. 523, 528, 93 L. Ed. 2d 920, 927, 107 S. Ct. 828, 832, quoting *Miranda v. Arizona* (1966), 384 U.S. 436, 474, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1628.) One rule requires that before police institute custodial interrogation, they must inform the accused of his right to have counsel present. (*Miranda v. Arizona* (1966), 384 U.S. 436, 473, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627.) "If [after being informed of that right] the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." 384 U.S. at 474, 16 L. Ed. 2d at 723, 86 S. Ct. at 1628.

The record shows that the defendant clearly invoked his right to counsel while being held in custody at the Skokie police station following his arrest. After the as-

sistant State's Attorney asked the defendant whether he wished to talk to an attorney and have him present with him before and while he was being questioned, the defendant responded "Yes." His response was unequivocal and it invoked his right to counsel and for counsel to be present. See *Smith v. Illinois* (1984), 469 U.S. 91, 96-97, 83 L. Ed. 2d 488, 494, 105 S. Ct. 490, 493; *Miranda v. Arizona* (1966), 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627.

The State, however, argues that the defendant's response, considered in the entire circumstances, was ambiguous. The State says that the defendant had previously been advised of his fifth amendment rights three times and had never invoked his right to counsel. The State also points to the testimony of Sergeant O'Keefe, who stated that before the defendant was questioned by the assistant State's Attorney, he volunteered to give a statement to O'Keefe but was told to wait until the attorney arrived. The State asserts too that the defendant responded to further continued police questioning after he was advised of his *Miranda* rights. These events, the State claims, render the defendant's request for counsel ambiguous and therefore did not constitute an effective invocation of that right.

The defendant's response, even when considered in the entirety of the circumstances that preceded it, cannot be viewed as anything other than an unambiguous invocation of his right to counsel. Furthermore, ambiguous statements or actions that preceded a request for an attorney only have relevance to the clarity of the request, which here was completely clear. As the Supreme Court held in *Connecticut v. Barrett* (1987), 479 U.S. 523, 529, 93 L. Ed. 2d 920, 928, 107 S. Ct. 828, 832, "[i]nterpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous."

It is true that the defendant, upon being questioned further, said that he wished to make a statement without a lawyer being present. Statements by an accused following a clear request for counsel, however, are irrelevant in determining whether there has been an effective invocation of that right. In *Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490, the Supreme Court stated that "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver." (Emphasis in original.) 469 U.S. at 100, 83 L. Ed. 2d at 496, 105 S. Ct. at 495.

Although the accused may validly waive his fifth amendment rights and voluntarily respond to questioning (see *North Carolina v. Butler* (1979), 441 U.S. 369, 372-76, 60 L. Ed. 2d 286, 291-94, 99 S. Ct. 1755, 1756-59), the Supreme Court has established a rigid "bright-line" standard for establishing a waiver of the right to counsel. (*Edwards v. Arizona* (1981), 451 U.S. 477, 485, 68 L. Ed. 2d 378, 387, 101 S. Ct. 1880, 1885; *Solem v. Stumes* (1984), 465 U.S. 638, 646, 79 L. Ed. 2d 579, 589, 104 S. Ct. 1338, 1343.) Under *Edwards*, to establish that a suspect has effectively waived his already invoked right to counsel, it must be shown that (1) the suspect initiated further communication with the police that demonstrates a desire to discuss the criminal investigation, and (2) as a separate matter and under the particular facts and circumstances of the case, that his purported waiver was knowing and intelligent. *Edwards v. Arizona* (1981), 451 U.S. 477, 485-86 n.9, 68 L. Ed. 2d 378, 387 n.9, 101 S. Ct. 1880, 1885-86 n.9; *Smith v. Illinois* (1984), 469 U.S. 91, 95, 83 L. Ed. 2d 488, 494, 105 S. Ct. 490, 493; *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1046, 77 L. Ed. 2d 405, 413, 103 S. Ct. 2830, 2835.

The record shows that the defendant did not effectively waive his right to counsel, as he did not initiate further discussion following his request for counsel. Following his affirmative response to the question of whether he wished counsel, the assistant State's Attorney continued to read the defendant his rights and then pressed him to determine whether he wanted an attorney "now." The Supreme Court has clearly stated that as a precondition to a finding of waiver it must be established that the accused, rather than the police, reopened dialogue of the subject matter of the investigation. (See *Edwards v. Arizona* (1981), 451 U.S. 477, 485, 68 L. Ed. 2d 378, 387, 101 S. Ct. 1880, 1885; *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1044, 77 L. Ed. 2d 405, 411, 103 S. Ct. 2830, 2834.) Furthermore, given the conflicting subsequent responses and the defendant's obvious confusion as to his right to counsel, it cannot be reasonably argued that his willingness to speak at times to his questioners constituted a knowing and intelligent waiver of the right to counsel.

We conclude that the defendant unequivocally invoked his right to counsel and that the State has failed to meet its "heavy burden" of establishing that the defendant waived that right. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628.) Consequently, the admission of the defendant's inculpatory statements at trial violated his fifth and fourteenth amendment rights. *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880; *Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490.

The State argues that even if the defendant's statements were taken in violation of his fifth amendment rights, their admission into evidence was harmless beyond a reasonable doubt.

In order for an error to be held harmless, a reviewing court must be satisfied beyond a reasonable doubt that

the error did not contribute to the defendant's conviction. (*Chapman v. California* (1967), 386 U.S. 18, 23, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827; *Fahy v. Connecticut* (1963), 375 U.S. 85, 86-87, 11 L. Ed. 2d 171, 173, 84 S. Ct. 229, 230; *People v. Knippenberg* (1977), 66 Ill. 2d 276, 287-88.) To determine whether an error is harmless, "it is necessary to review the facts of the case and the evidence at trial" to determine the effect of the unlawfully admitted evidence "upon the other evidence adduced at trial and upon the conduct of the defense." *Fahy v. Connecticut* (1963), 375 U.S. 85, 87, 11 L. Ed. 2d 171, 173-74, 84 S. Ct. 229, 230-31. See also *Harrington v. California* (1969), 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726.

The State maintains that the error was harmless beyond a reasonable doubt on the ground that even without the defendant's statement, the evidence of his guilt was still overwhelming. Specifically, the State contends that the testimony of Jackie Gibons and the fact that the defendant's belt was found in the victim's residence was sufficient to establish the defendant's guilt beyond a reasonable doubt.

Confessions carry "extreme probative weight," and therefore the admission of an unlawfully obtained confession rarely is harmless error. (See *Christopher v. Florida* (11th Cir. 1987), 824 F.2d 836, 846; *United States v. Hernandez* (5th Cir. 1978), 574 F.2d 1362, 1372; *United States v. Poole* (9th Cir. 1986), 794 F.2d 462, 467-68.) Furthermore, not only did the prosecution make use of the confession, but the defendant's counsel also alluded to it in both his opening and closing arguments to the jury. In closing, his attorney stated:

"We have read the statement. No one is going to tell you he didn't go to that house. He was sent off by Barry and went to that house and entered it. Jackie gave him a hammer, and Ben Gibons was killed. I don't deny that,

and I say that again I think you have to appreciate what my position is."

The admission of the statements of Wilson and Gibons, though consideration of them was limited by the court's instructions to the jury, may have aggravated the prejudice resulting from the improper admission of the defendant's statements. We would note that the appellate court has reversed Wilson's and Gibons' convictions on the ground that the trial court erred in admitting their confessions at trial after denying their motions for severance. See *People v. Gibons* (1986), 149 Ill. App. 3d 37.

Even in the face of the other evidence of guilt, under the circumstances here we are unable to declare beyond reasonable doubt that the defendant's confession did not contribute to the conviction.

We do not agree with the defendant's contention, however, that the other evidence was insufficient to prove him guilty beyond a reasonable doubt, thus precluding his retrial. (See *People v. Taylor* (1979), 76 Ill. 2d 289, 309.) The testimony of Jackie Gibons and the evidence that the defendant's belt was found in the Gibonses' residence provides sufficient evidence to require a retrial. The evidence is not such as to necessarily leave a reasonable doubt of the defendant's guilt. *People v. Hernandez* (1988), 121 Ill. 2d 293, 319-20; *People v. Willingham* (1982), 89 Ill. 2d 352, 358-59.

In view of the disposition we make, it will not be necessary to consider the defendant's contention that his court-appointed attorney repeatedly admitted his guilt to the jury without his prior consent, and as a result, he was denied the effective assistance of counsel assured by the sixth and fourteenth amendments of the Constitution of the United States. We are confident that upon retrial, guided by this court's decision in *People v. Hattery* (1985), 109 Ill. 2d 449, proper care will be taken to in-

sure that the defendant will have the unimpaired benefit of effective assistance of counsel. *United States v. Cronic* (1984), 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047.

Other errors complained of by the defendant are not of such nature as can be expected to recur upon a new trial and need not be considered here. For the reasons given, the judgment of the circuit court of Cook County is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*