NOTICE
Decision filed 02/05/16. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2016 IL App (5th) 130341-B

NO. 5-13-0341

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| *In re* D.L.H., JR., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 12-JD-235 |
| | ) | |
| D.L.H., Jr., | ) | Honorable |
| | ) | Walter C. Brandon, Jr., |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.
Presiding Justice Schwarm and Justice Chapman concurred in the judgment and opinion.

**OPINION**

¶ 1    This case originated after the State filed a petition for adjudication of wardship in the circuit court of St. Clair County, alleging respondent, D.L.H., Jr., age 9, committed first degree murder by repeatedly striking 14-month-old T.W. about the head (720 ILCS 5/9-1(a)(2) (West 2012)).  The circuit court found respondent unfit to stand trial and in a later discharge hearing found respondent "not not guilty" of murder.  The circuit court remanded respondent to the Department of Human Services (the Department) for fitness restoration for the maximum period of up to five years so that respondent may become fit

1

and be tried for murder. Respondent appealed, arguing *inter alia* that the circuit court erred in denying his motion to suppress two statements he made to police. In an unpublished order, we found both statements involuntary, and we reversed and remanded for a new discharge hearing. *In re D.L.H.*, 2013 IL App (5th) 130341-U. We also found the other issues raised by respondent outside of the suppression issues were not likely to recur upon remand, and, therefore, did not address the other issues raised by respondent. *In re D.L.H.*, 2013 IL App (5th) 130341-U, ¶ 42.

¶ 2    The State filed a petition for leave to appeal, which our supreme court granted. *In re D.L.H.*, No. 117341, 5 N.E.3d 1123 (table) (Ill. Mar. 18, 2014). Ultimately, the court determined the first statement was voluntary, but the second was not. The supreme court affirmed in part, reversed in part, and remanded with directions for us to conduct a harmless error analysis with regard to the second statement and "to consider any other claims of error previously raised but not decided that are necessary to the proper disposition of this case." *In re D.L.H.*, 2015 IL 117341, ¶ 81, 32 N.E.3d 1075.

¶ 3    Considering the passage of time, we provided the parties an opportunity to file supplemental briefs addressing claims of error previously raised but not decided which may be deemed necessary to the proper disposition of this case. In his brief, respondent raises the following issues: (1) whether the erroneous admission of his second statement to police was harmless error; and (2) whether the evidence was sufficient to support the not not guilty finding. The State filed a reply brief and later filed a motion to strike from respondent's supplemental brief a new argument which the State claims was not

2

previously raised in this court and would be outside the mandate of our supreme court's order remanding this case to us. We deny the State's motion to strike.

¶ 4                                    BACKGROUND

¶ 5    The facts of this case have previously been recited both by this court and our supreme court, and we borrow liberally from those statements of fact. The case began when the State filed a petition for adjudication of wardship which alleged respondent committed first degree murder of T.W. by repeatedly striking him in the head. Respondent's mother died when he was three years old. He lived with his father, David, and David's girlfriend, Melissa, in Cahokia. Additional members of the household included David and Melissa's 9-month-old son, Daveon, Melissa's 11-year-old son, Dre, Melissa's cousin, Alisha, and her three sons, Todd, Tymerian, and T.W.

¶ 6    An ambulance was called to the family home in the early morning hours of August 23, 2012, after T.W. was found unresponsive. He was admitted to Cardinal Glennon Hospital in St. Louis for nonaccidental injuries. T.W. died on August 26, 2012, after being removed from life support. Two days later the State filed a petition for adjudication of wardship.

¶ 7    The circuit court appointed counsel for respondent and ordered a psychological evaluation. Dr. Daniel Cuneo, a clinical psychologist, performed an evaluation. Dr. Cuneo determined that respondent is borderline mentally retarded with an IQ of 78, he is in the bottom 5% of the nation intellectually, and both his short-term and long-term memory are impaired. Dr. Cuneo opined respondent was unfit for trial and there was not

3

a substantial probability he would be able to attain fitness within a year. Dr. Cuneo's opinion was based upon respondent's age, his cognitive and developmental immaturity, and his borderline intellectual functioning. Dr. Cuneo estimated respondent's cognitive abilities as those of a seven- or eight-year-old who was unable to grasp the adversarial nature of the proceedings against him and could not assist in his own defense. Dr. Cuneo diagnosed respondent with depression and said he would benefit from inpatient psychiatric treatment and possibly medication. Dr. Cuneo surmised that respondent is the scapegoat in his family because he is blamed for all the difficulties the family experiences. Dr. Cuneo estimated it is possible respondent could be restored to fitness within five years because as respondent gets older his abstract thinking should improve. Ultimately, the circuit court found respondent unfit to stand trial with no reasonable probability he would be restored to fitness within one year. See 725 ILCS 5/104-16(d) (West 2012).

¶ 8    On November 15, 2012, the trial court granted respondent's motion for appointment of a guardian *ad litem* after respondent's father was arrested for child endangerment in connection with the events leading to the death of T.W. Respondent was subsequently placed with an aunt. The Department later recommended respondent be placed with Streamwood Behavior Healthcare System. After being placed in that facility, respondent was evaluated for possible commitment under the Mental Health and Developmental Disabilities Code. See 725 ILCS 5/104-23(b)(3) (West 2012). After the evaluation concluded respondent was not a danger to himself or to others and did not meet the criteria for civil commitment, the trial court returned respondent to his aunt and

ordered respondent's counsel to provide the court with an outpatient fitness restoration plan, mental health services, and a schooling plan.

¶ 9    The trial court also granted the State's motion for a discharge hearing. Prior to the hearing, respondent filed a motion to suppress all statements he made to "anyone" during the investigation of T.W.'s injuries. In an amended motion, respondent focused on two statements he made to Detective Sean Adams of the Cahokia police department. After a hearing, the trial court denied respondent's motion to suppress, finding respondent was not in custody at the time of police questioning, he voluntarily waived his *Miranda* rights, and his statements were voluntary.

¶ 10   A discharge hearing, previously scheduled for March 27, 2013, was continued on the guardian *ad litem*'s motion to have Dr. Cuneo examine respondent as to his sanity at the time of the offense. See 720 ILCS 5/6-2 (West 2012). After examining respondent, Dr. Cuneo explained that he was legally sane at the time of the offense and was able to "appreciate the wrongfulness of severely beating a 14-month-old" and that "beating a child could cause the child's death." During the interview, respondent told Dr. Cuneo that Dre hit T.W. and threw him against a wall and ordered respondent to hit the baby. When respondent refused, Dre hit respondent in the face, so respondent hit T.W. one time out of fear that if he failed to do so, Dre would hit respondent again.

¶ 11   On May 22, 2013, the cause proceeded to a discharge hearing. Witnesses included Tara Welch, a physical therapist assistant, who visited the home on the afternoon of August 22, 2012, and found T.W. to be "happy" and "fine" with no apparent injuries.

5

Edna Norman, a Department of Children and Family Services (DCFS) caseworker, testified that she interviewed respondent on August 23, 2012. During that interview, respondent admitted he had been alone in the playroom with T.W. the previous evening and he punched T.W. twice in the head and once in the side to try to stop him from crying. Respondent said T.W. threw up "some white stuff" after being struck in the side and then stopped crying. Respondent then carried him in a bedroom and placed him on the bed.

¶ 12   Edna also testified she noticed Todd's lip "seemed a little swollen," and when she asked respondent what happened to Todd, respondent admitted he also punched Todd the previous evening. Edna testified when she interviewed Dre, he said he was in the master bedroom with Todd and Tymerian, and after seeing respondent carry T.W. into an adjacent bedroom, he checked on T.W. and saw T.W.'s stomach "jumping."

¶ 13   At the discharge hearing, Dre blamed respondent for T.W.'s injuries. Dre testified the children were all left home without adult supervision. He was in the master bedroom when he heard a "boom, boom" that "sounded like somebody was hitting the wall." After hearing another "boom, boom" sound, Dre checked on T.W. and it seemed "like he was dead or something." Dre brought respondent into the master bedroom and called his mother, who made him talk to Alisha. When he told Alisha he thought something was wrong with T.W., she indicated that she would be home soon. Dre testified the adults failed to arrive until approximately 90 minutes later. During this time, T.W. was on the bed making "funny noises" that sounded "like he was hurt or something." T.W.'s fists were also "balled up" and his "stomach was going in and out." Dre testified that even

6

after the adults arrived home, no one immediately checked on T.W., but instead went to bed.

¶ 14 Dre admitted he did not see anybody hit T.W. on the night in question and that he previously lied about the children being left unattended because he did not want his mother to get into trouble. He also admitted he lied in a statement he gave to the Child Advocacy Center by indicating that "Fatty" and "Pooh" were at the house on the night T.W. was injured. Dre explained his mother told him to say that Fatty and Pooh, two people who used to live around the corner, were at the house. Respondent and his father, David, were in the car when his mother coached him. Dre also explained that David told him not to say respondent hit T.W. because nobody knew who did. On cross-examination, Dre testified about a previous head injury to T.W. caused by Fatty. Dre said Fatty was holding T.W. in the air when the baby fell from his hand. Dre saw T.W. hit the top of his head on a table and begin to cry.

¶ 15 Melissa's stepmother, Joyce, testified that on the night in question, Melissa, Alisha, David, and Daveon stopped by her apartment. She confirmed that Dre called to tell Alisha and Melissa that respondent hit T.W. She said everyone left shortly after the call. Joyce testified Melissa later called her to tell her something was wrong with T.W. Melissa later stopped by her apartment accompanied by David, Dre, and respondent. Joyce asked respondent if he hit T.W., and respondent admitted he did. Joyce said respondent did not indicate anyone else hit T.W.

¶ 16    Detective Sean Adams of the Cahokia police department interviewed respondent on August 24 and 26, 2012. Both interviews occurred in the kitchen of the house where respondent lived. He read respondent his *Miranda* rights before the first interview. When asked to initial the document, respondent instead signed his name. Respondent indicated at the second interview that he still understood his *Miranda* rights. His father was present at both interviews, but no attorney was present at either interview. Over respondent's objection, both video recordings of the interviews were admitted and played for the court.

¶ 17    In the first interview, respondent denied hitting T.W. and implicated Dre. He also admitted that he told the DCFS caseworker, "I did it." However, he explained the reason he admitted he hit T.W. was only because he was afraid his father and the other adults would go to jail. Respondent agreed with Adams that he made a mistake when he told the DCFS worker he hit T.W. and only did so because he was trying to make sure nobody got in trouble and added he was scared "cause I thought I was gonna get tooken away."

¶ 18    In the second interview, respondent again implicated Dre, but after Adams repeatedly assured him no consequences would attach to an admission and that any injury was simply an accident, respondent finally admitted to hitting T.W. once in the head.

¶ 19    The State's final witness was Dr. Jennifer Forsyth, who performed the autopsy on T.W. on August 27, 2012. Even though the discharge hearing was being conducted nearly nine months after the autopsy was completed, no autopsy report was yet available and the death certificate was not yet certified. Dr. Forsyth testified the cause of death

was a closed head injury and the death was a homicide caused by "diffuse axonal injury" (trauma throughout the brain) and "cerebral edema" (brain swelling). According to Dr. Forsyth, a person with this type of injury would quickly become lethargic, nonresponsive, and limp, and could suffer seizures. Vomiting and flexing of the hands into a fist are also associated with such an injury. Although T.W.'s injuries were consistent with injuries that could have been sustained on August 22, 2012, Dr. Forsyth admitted it was not possible to determine exactly when or how T.W.'s injuries were inflicted or whether he was shaken. Dr. Forsyth said she did not observe any injury below the neck either at the autopsy or microscopically.

¶ 20 The State argued in closing that respondent was solely responsible for T.W.'s injuries, but even if the court believed Dre was involved, respondent's admission to Detective Adams during the second interview that he hit T.W. in the head once was sufficient to meet the State's burden to prove first degree murder under an accountability theory.

¶ 21 On June 5, 2013, the trial court entered an order finding (1) respondent not not guilty of first degree murder and (2) the treatment period for fitness restoration may be extended to the maximum statutory period of five years. Respondent appealed, arguing "(1) the trial court erred in denying his amended motion to suppress statements, (2) the trial court erred in allowing Dr. Forsyth to testify as an expert witness, (3) the trial court erred in finding him not not guilty of first-degree murder, and (4) he was prejudiced by the unavailability of T.W.'s death certificate and autopsy report." *In re D.L.H.*, 2013 IL App (5th) 130341-U, ¶ 29. We reversed and remanded on the basis that the trial court's

9

findings that respondent voluntarily waived his *Miranda* rights and his statements to Detective Adams were voluntary were against the manifest weight of the evidence. We chose not to address the other issues raised by respondent because we found the issues were not likely to occur upon remand.

¶ 22 Our supreme court granted the State's petition for leave to appeal. On appeal, that court determined the first statement was voluntary, but the second was not. Accordingly, the court affirmed in part, reversed in part, and remanded with directions for us to conduct a harmless error analysis with regard to the second statement and "to consider any other claims of error previously raised but not decided that are necessary to the proper disposition of this case." *In re D.L.H.*, 2015 IL 117341, ¶ 81, 32 N.E.3d 1075.

¶ 23                              ANALYSIS

¶ 24                         I. Harmless Error

¶ 25 The first issue is whether the admission of respondent's second statement to police was harmless error. Respondent contends the admission of the second statement was not harmless error because it was the only evidence that was not retracted or did not have serious credibility issues that supported the finding that respondent inflicted the harm that caused T.W.'s death. Respondent insists the other evidence was so compromised and underwhelming there is no way we can find that respondent's admission to Detective Adams that he hit T.W. once in the head did not contribute to the finding of not not guilty. The State responds the second statement to the police was harmless error because

10

it was cumulative of other competent evidence of guilt, including inculpatory statements respondent made to a DCFS caseworker, Edna Norman, and Melissa's stepmother, Joyce.

¶ 26    In order for an error to be harmless, a reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. *Chapman v. California*, 386 U.S. 18, 24 (1967). In determining whether error is harmless, the State bears the burden of establishing beyond a reasonable doubt that the trial court's error did not contribute to the verdict obtained. *People v. Patterson*, 217 Ill. 2d 407, 428, 841 N.E.2d 889, 901 (2005). Three approaches are used in determining whether an error is harmless: (1) whether the error might have contributed to the conviction; (2) whether other properly admitted evidence overwhelmingly supports the conviction; and (3) whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *Patterson*, 217 Ill. 2d at 428, 841 N.E.2d at 902.

¶ 27    "[A] confession is the most powerful piece of evidence the State can offer, and its effect on [the trier of fact] is incalculable." *People v. R.C.*, 108 Ill. 2d 349, 356, 483 N.E.2d 1241, 1245 (1985). Because confessions carry extremely probative weight, the admission of an unlawfully obtained confession is rarely harmless error. *People v. St. Pierre*, 122 Ill. 2d 95, 114, 522 N.E.2d 61, 69 (1988). In the instant case, we cannot conclude respondent's confession in the second statement did not have an impact upon the determination of the trial court.

¶ 28    We agree with respondent that apart from the confession in the second statement, the evidence against respondent is not overwhelming. The State relied heavily on the

11

testimony of Edna Norman, a DCFS caseworker, who interviewed respondent the day T.W. was admitted to the hospital. She testified respondent admitted he punched T.W. twice in the head and once in the side the previous evening. However, during his first interview with Detective Adams, respondent denied hitting T.W. and explained he lied to the DCFS caseworker when he told her he hit T.W. He said he lied because he was trying to protect his father and other adults who left five children, age 11 and under, home alone while the adults went out for the evening. Respondent did not want to see his father or the other adults go to jail.

¶ 29 The State also relied on the testimony of Melissa's stepmother, Joyce, who testified she asked respondent whether he hit T.W. and respondent admitted he did. Joyce did not testify to any details about the alleged hitting, but merely submitted that respondent admitted he hit T.W. on the night in question. However, it is important to note that Joyce and respondent are not related. As Melissa's stepmother, she is Dre's grandmother. Therefore, her testimony is somewhat suspect as she would be more inclined to protect Dre over respondent. Her testimony is even more suspect considering the fact that several credible sources, including Dr. Cuneo, believe respondent is the family's scapegoat.

¶ 30 Furthermore, the medical evidence in this case is weak. There were very few visible injuries to T.W. at the time of the autopsy. Dr. Forsyth specifically testified it was impossible to determine when or how T.W.'s injuries were inflicted or whether or not T.W. was shaken. Under these circumstances, we cannot say the properly admitted evidence overwhelmingly supports the trial court's not not guilty finding.

¶ 31 Finally, not only was the second statement wrongfully admitted into evidence, but it was specifically relied upon by the State during closing argument as follows:

"I would submit to you that the evidence shows that [respondent] is solely responsible. But if the court does entertain the possibility that [Dre] was involved, the minor, himself, admits to accountability, being involved. Accountability under Illinois law is aid, abet, assist during or before the commission of the offense in any way. And so even the admission that he hit the baby in the side while the baby was in the back play room is enough for the People to meet the burden that he assisted in the beating of [T.W.].

That−again, I want to let the [c]ourt know, that's not what we believe the evidence shows. But if you believe solely the minor's own account of events, which we believe that has−that credibility has been challenged, but if you believe solely that, the [c]ourt must still find there's sufficient evidence to prove guilty beyond a reasonable doubt."

In light of these comments made during closing argument, we cannot say the improper admission of respondent's second statement was harmless beyond a reasonable doubt.

¶ 32 Because the evidence against respondent is not overwhelming and the second statement was the basis for the State's accountability argument, we find admission of the second statement constitutes reversible error. We, therefore, remand for a new discharge hearing. The new discharge hearing should be conducted without use of the second statement.

13

¶ 33                                    II. Other Issues

¶ 34    Our supreme court has also directed us "to consider any other claims of error previously raised but not decided that are necessary to the proper disposition of this case." *In re D.L.H.*, 2015 IL 117341, ¶ 81, 32 N.E.3d 1075. Respondent again asserts the evidence was insufficient to support the finding of not not guilty of first degree murder. While we admit we are not overwhelmed with either the medical evidence or the evidence of intent, we cannot say the trial court erred in finding the respondent not not guilty.

¶ 35    When presented with a challenge to the sufficiency of the evidence, a reviewing court's function is not to retry a defendant. *People v. Givens*, 237 Ill. 2d 311, 334, 934 N.E.2d 470, 484 (2010). Rather, we must consider " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Davison*, 233 Ill. 2d 30, 43, 906 N.E.2d 545, 553 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under this standard, a reviewing court must draw all reasonable inferences from the record in the State's favor. *Davison*, 233 Ill. 2d at 43, 906 N.E.2d at 553.

¶ 36    At the time of T.W.'s death, respondent was a nine-year-old child with a low IQ who, by many accounts, including Dr. Cuneo's, served as the family's scapegoat. Considering respondent's age, his lack of maturity, and the family dynamics involved in this case, we cannot help but question whether respondent could form the necessary

intent to be convicted of first degree murder. However, we also cannot ignore Dr. Cuneo's examination which revealed respondent was legally sane at the time of the offense and was able to "appreciate the wrongfulness of severely beating a 14-month-old," as well as the fact that Dr. Cuneo believed respondent was aware that such a beating could cause death. Nor can we ignore the fact that T.W. died from nonaccidental injuries and, according to Dr. Forsyth, his injuries were consistent with injuries that could have been inflicted the day before T.W. was admitted to the hospital. Therefore, after viewing the evidence in the light most favorable to the State, we cannot say no rational trier of fact could have found respondent not not guilty.

¶ 37 Another previously raised issue likely to appear upon remand is whether Dr. Forsyth is qualified to testify as an expert. Respondent contends Dr. Forsyth is not qualified to testify as an expert. We disagree.

¶ 38 In *People v. Lovejoy*, 235 Ill. 2d 97, 919 N.E.2d 843 (2009), our supreme court specifically stated:

> "The decision to qualify a witness as an expert rests within the sound discretion of the trial court. [Citation.] We will find an abuse of discretion only where the trial court's decision is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court. [Citation.] A person can be permitted to testify as an expert if that person's experience and qualifications afford him or her knowledge that is not common to the average layperson and will assist the jury in evaluating the evidence and reaching a

15

conclusion. [Citation.] There are no precise requirements regarding experience, education, scientific study, or training. [Citation.]" *Lovejoy*, 235 Ill. 2d at 125, 919 N.E.2d at 858-59.

Here, we cannot say the trial court abused its discretion in accepting Dr. Forsyth as an expert.

¶ 39 Dr. Forsyth is a board-certified pathologist whose experience and qualifications give her knowledge beyond what is common to any layperson. Respondent's arguments concerning Dr. Forsyth's limited background in pediatric forensic pathology at the time she performed the autopsy on T.W. reflect the weight to be afforded her testimony rather than its admissibility. On remand, questions regarding Dr. Forsyth's lack of expertise in pediatric pathology go toward the question of reliability of her testimony and can be properly considered by the trial court in determining what weight to give her testimony; however, respondent has failed to convince us that Dr. Forsyth's testimony should be excluded. Finally, we note the problems presented by lack of a death certificate and autopsy report should be cured upon remand, as surely by now both are available.

¶ 40                                  CONCLUSION

¶ 41 For the foregoing reasons, we affirm in part, reverse in part, and remand with directions for the trial court to conduct a new discharge hearing without use of respondent's second statement to Detective Adams. We have carefully considered the directions of our supreme court to address not only the harmless error issue, but other claims previously raised but not decided. We note that any other issues raised which we

16

have not addressed are not likely to occur on remand and, thus, we need not to address them herein.

¶ 42    Affirmed in part, reversed in part, and remanded with directions.

2016 IL App (5th) 130341-B

NO. 5-13-0341

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* D.L.H., JR., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 12-JD-235 |
| | ) | |
| D.L.H., Jr., | ) | Honorable |
| | ) | Walter C. Brandon, Jr. |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

**Opinion Filed:**  February 5, 2016

_____

**Justices:**  Honorable Richard P. Goldenhersh, J.

Honorable S. Gene Schwarm, P.J., and
Honorable Melissa A. Chapman, J.,
Concur

_____

**Attorneys**  Bill T. Walker, Law Office of Bill T. Walker, 3388-B Maryville Road,
**for**  P.O. Box 1800, Granite City, IL 62040; James E. Parrot, Law Office of
**Appellant**  James E. Parrot, 1221 Locust Street, Suite 1000, St. Louis, MO 63103

_____

**Attorneys**  Hon. Brendan F. Kelly, State's Attorney, St. Clair County Courthouse,
**for**  10 Public Square, Belleville, IL 62220; Patrick Delfino, Director,
**Appellee**  Stephen E. Norris, Deputy Director, Jennifer Camden, Staff Attorney,
Office of the State's Attorneys Appellate Prosecutor, 730 East Illinois
Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864

_____