2024 IL App (1st) 211083

SECOND DIVISION
December 24, 2024

No. 1-21-1083

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| | ) | |
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| | ) | Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | Nos. 13 CR 20552/02 and |
| v. | ) | 12 CR 20961 |
| | ) | |
| DARRELL LEVERSON, | ) | Honorable |
| | ) | Michele McDowell Pitman, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |
| | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    Over a few hours in early October 2012, several individuals engaged in a crime spree through south suburban Dolton. By the end, several people had been robbed at gunpoint, another had been shot at, and one person lay dead in his driveway. On October 10, 2012, police arrested 19-year-old Darrell Leverson after a car crash and brief chase as a suspect in the crime. He was taken to the Dolton Police Department.

¶ 2    Over the next 72 hours, police interrogated Leverson a total of seven times, shuttling him between a holding cell and an interview room. In the first six interviews, Leverson said nothing incriminating. In many of those interviews, however, he unequivocally and repeatedly asked for

a lawyer or for a phone call to contact one. For various reasons, none of which were remotely valid, the police refused to allow him access to an attorney and permitted only one phone call over a three-day period. Simply put, short of physical torture, the Dolton police violated *Miranda* and the fifth amendment in just about every way they are capable of being violated.

¶ 3      As his detention at the police station stretched into the final hour of a third straight day, Leverson agreed to talk with the police. During this seventh interview, he made several inculpatory statements that were later used against him at trial. After asking to read a transcript of the interview during deliberations, a jury convicted Leverson of first-degree murder, attempted first-degree murder, and several armed robberies and other felonies.

¶ 4      On appeal, as in the trial court, Leverson claims his confession was involuntary. He points out that police lied to him about his rights to speak with counsel or make a phone call, disregarded his repeated requests to speak to a lawyer, and interrogated him seven times over three days, at one point threatening him with the death penalty and suggesting he would be sexually assaulted in jail.

¶ 5      The State "does not in any way condone the actions taken by the detectives in this case" but claims that Leverson nevertheless voluntarily waived his rights before his seventh interrogation. Alternatively, the State claims that any error in the admission of the confession was harmless beyond a reasonable doubt.

¶ 6      We reverse and remand for a new trial. Leverson's admissions came at the culmination of a series of coercive tactics orchestrated by investigators over three days. We cannot look the other way when the police flagrantly disregard a defendant's rights when he asserts them and then badger him into waiving those rights. And though the State's case was built on more than his statement, Leverson's self-incriminating words were the cornerstone of many charges and the

consistent thread that tied the State's case together. The error in admitting this confession was not harmless beyond a reasonable doubt.

¶ 7                                           BACKGROUND

¶ 8     The following facts come mainly from two hearings: a pretrial hearing to suppress Leverson's statements to police, in which videos of all his interviews were entered into evidence, and Leverson's subsequent jury trial. The State charged Leverson, Kevin Eason, and Eddie Fleming with multiple crimes in connection with the following spree of crimes committed in the south suburbs of Cook County in early October 2012.

¶ 9                                I. Robbery of Gregory Harris

¶ 10    On October 9, 2012, Gregory Harris was off to see a friend, Tisha Prince, who lived in Dolton near Blouin Drive and Ellis Street. At around 10 p.m., Harris took a bus toward 154th Street and Cottage Grove Avenue, then began to walk toward Prince's house.

¶ 11    As he was walking on Ingleside Street, two men with handguns jumped out of nowhere. One man, taller than the other, went behind Harris, put his gun on him, and took Harris's coat, watch, some cash, a wallet, his cell phone, and a PlayStation 3 video game machine. The shorter man stood in front the whole time, his gun fixed on Harris.

¶ 12    The taller man fled south with Harris's possessions. The shorter man told Harris to turn around or he would get shot; Harris ran off in the opposite direction.

¶ 13    Harris walked to his friend's house. As he arrived, he heard gunshots coming from the east down Blouin Drive. Harris and Prince walked together down the street toward the gunshots, where Harris saw a person lying on a driveway. Police eventually arrived on the scene.

¶ 14    Harris spoke with Dolton police officer Curtis Rentson but said he did not want to file a report. Harris did tell officers that he had been robbed, however, and thought it might be related

to the shooting. He said only one or two minutes passed between the time he was robbed and when he heard the gunshots. He told Rentson that the robbers left the scene in a gray Ford SUV and that one was approximately 5 feet, 11 inches, while the other was 5 feet, 6 inches.

¶ 15                                  II. Murder of Derrick Hampton

¶ 16    The gunshots Harris heard around 10:30 p.m. occurred near a house on the 1000 block of Blouin Drive in Dolton. Derrick Hampton was getting ready to go to work. While Hampton was in his driveway, someone shot him, killing him. There were no eyewitnesses. Hampton's daughter, who was home at the time, heard gunshots and went outside. She found her father lying on the ground next to some pieces of wood. Two 9-millimeter shell casings were found on the driveway. Officer Rentson was dispatched to the scene and arrived shortly thereafter. When Officer Rentson arrived, he saw Gregory Harris standing across the street.

¶ 17                                  III. Robbery of Ravetta Moore

¶ 18    Now around 10:50 p.m., Ravetta Moore was driving toward Calumet City to visit a friend for her birthday. Along the way, she came to an intersection at the same time as a Jeep Liberty SUV; the driver of the Jeep waved her through the intersection, and Moore continued to her friend's house.

¶ 19    She reached the house, in the 200 block of Hoxie Avenue in Calumet City, and pulled into her friend's driveway. Moore was busy on her phone for a moment, then looked up to see a man with a gun standing by her car window. Moore later identified the man as Kevin Eason.

¶ 20    The man with the gun ordered her out of the car. As she complied, Moore saw a taller man, clothed in a hoodie and mask, whom she could not identify. This man pulled Moore from her car and snatched her designer purse before pushing Moore to the ground. The men rummaged through Moore's car before fleeing. Moore later realized that her iPhone was missing.

¶ 21    Police found Gregory Harris's state ID card not far from where Moore was robbed.

¶ 22                    IV. Carjackings of Robert Hopkins and Joyce Johnson

¶ 23    Meanwhile, at about 11 p.m., Robert Hopkins and his then-girlfriend, Joyce Johnson, were wrapping up an evening at Hopkins's house in the 14000 block of South Woodlawn Avenue in Dolton. They had parked their cars—a blue Lexus GS and a Chevy Equinox—next to each other in Hopkins's driveway and were walking toward them when two men approached.

¶ 24    One of the men walked up to Hopkins, who was at the side of his house, stuck a gun in his face, and said "give me the money." Another man appeared and searched Hopkins's pockets. They took his keys and phone, then told him to lie down.

¶ 25    The men then went over to Johnson, who was sitting in her car. One of the men, armed with a gun, told Johnson to get out. She then gave him her debit and credit cards and some cash. One man then drove off in Hopkins's Lexus, while the other got into Johnson's Chevy and took it. Both began to follow a Jeep that had been parked in the street.

¶ 26    A few days later, Hopkins identified Eason as one of the robbers. He could not identify the other assailant. Hopkins told police that both robbers were about the same height.

¶ 27                    V. Robbery of Willie Douglas

¶ 28    Shortly thereafter, at about 11:15 p.m., Willie Douglas was in his parked car with his girlfriend in Riverdale. A dark-colored car pulled up, and two men jumped out. One approached with a gun, opened the driver's door, and ordered Douglas out and to the ground. The men then went through his car, and the armed assailant rummaged through Douglas's pockets. The men took Douglas's bank card, cell phone, and leather jacket.

¶ 29    Douglas identified Kevin Eason as the man with the gun. Douglas told the police that night that he did not get a good look at the passenger in the Lexus and could not identify him.

Some 20 days later at the police station, however, Douglas identified Leverson as the passenger in the Lexus who rummaged through his car.

¶ 30                              VI. Attempted Robbery of Angela Feaster

¶ 31     As the clock inched closer to midnight, Angela Feaster was parked in front of her house in Chicago, her child asleep in the back. She was speaking on her phone when a dark blue Lexus pulled up beside her. Two people were inside; Feaster later identified Eason as the driver. The Lexus then backed up and blocked her car. The passenger was tall, had a light complexion and "pretty eyes" in Feaster's words, and was clad in a hoodie. He jumped out of the Lexus and pulled a silver semiautomatic pistol from his pocket. He approached Feaster on the driver's side and tried to get into her car.

¶ 32     Feaster, fixated on the barrel of the gun, thought she was going to die. As the man reached for the door, Feaster put her car in reverse and heard the gun go off. She sped off with the Lexus in pursuit and drove to the Harvey police station. Somewhere along the way, the Lexus broke off. There were no bullet holes in Feaster's car.

¶ 33                              VII. Robbery of Phillip Neal

¶ 34     The calendar flipped over to October 10, 2012. At approximately half past midnight, Phillp Neal was getting home. As he pulled into his driveway, he saw a dark Lexus driving down the street. It stopped in front of his driveway, and a man wearing a black hoodie got out. The man approached Neal, who was still in his car, and rapped a gun on the window, telling Neal to open his door. When Neal obeyed, the man put the gun to Neal's head and demanded money. That man then ordered Neal out of the car and on his knees.

¶ 35     Another, shorter man, whom Neal later identified as Eason, came up to him and searched through his pockets. They took Neal's money, keys, phone, a Blackberry, and a military-style

bag with Neal's laptop inside. The men drove off in the Lexus.

¶ 36    At trial, Neal identified a backpack, computer, and Blackberry recovered from the Lexus as his.

¶ 37                            VIII. Police Pursuit and Investigation

¶ 38    Still early into October 12, at roughly 12:30 am, Officer Clarence Ayers responded to a call of an armed robbery, looking for a dark-colored Lexus. He found the Lexus and gave chase. The Lexus sped off, and a high-speed chase ensued. Eventually, the Lexus crashed into the side of a building. Two people, neither whom Ayers could identify, jumped out and dashed off in opposite directions. Police did not catch either individual at the time.

¶ 39    Inside the Lexus, police found a Smith and Wesson semi-automatic pistol near the front passenger seat. Later ballistics testing concluded that the gun matched a bullet taken from Hampton's body, as well as shell casings found on the scene of his murder. Feaster, Harris, and Douglas all recognized the gun as the one used by the men who robbed them.

¶ 40    The gun was tested for DNA. There was a mix of DNA profiles on the gun, and Leverson could not be excluded as a contributor to that mixture. That said, the State's expert could not tell when the DNA was deposited on the gun.

¶ 41    In addition to the gun, police found Douglas's identification card, his debit card, and an ATM receipt. Neal's backpack, computer, and leather jacket were also in the Lexus. Police also found a single shoe in the car; they later found its likely counterpart in Eason's room.

¶ 42    Finally, a DNA profile taken from the passenger-side airbag of the Lexus matched Leverson's profile.

¶ 43                            IX. Arrest of Defendant

¶ 44    At 4:45 p.m. on October 10, 2012, police were involved in another high-speed chase, this

time with a Jeep. Like the earlier one, the chase ended when the Jeep crashed. Officers responding to the chase saw Leverson running from the area and pursued him to a house on the 14500 block of South Emerald Street, where they arrested him on the front porch. One man, Phillip McNulty, told officers later that he, Eason, Leverson and Flemming were all in the Jeep together. Investigators later found Eason and Flemming's fingerprints inside the jeep, and Leverson's prints on a water bottle inside.

¶ 45    On October 12, 2012, the first robbery victim, Gregory Harris, went to the Dolton Police Department to view two lineups.

¶ 46    At trial, Harris said that he viewed the two lineups but did not identify anyone in either lineup. Then, someone else came into the room and identified Leverson in one of the lineups, Harris said. He testified that police told him he had to sign a statement to get his property back; but Investigator Cindy Tencza testified that nobody forced Harris to sign a statement to get his belongings. Investigator Tencza testified that Harris viewed both lineups and identified Leverson as the man who went through his pockets (the taller man).

¶ 47    After procuring a warrant, police searched Eason's bedroom. There, they found the aforementioned shoe, a 9-millimeter round of ammunition, an empty box formerly holding 9-millimeter Luger ammunition, Moore's Coach purse, Harris's watch, and Johnson's keys.

¶ 48                                      X. Interrogations of Defendant

¶ 49    After police arrested Leverson in the early afternoon on October 10, 2012, they took him to the Dolton Police Department. Over the next three days, officers would question him a total of seven times. Until the seventh interrogation, Leverson denied having any role in the crime spree. Videos of those interrogations and transcripts of them were entered into evidence during the motion to suppress Leverson's confession, and they are part of the record on appeal. We take the

facts from our review of those videos and transcripts.

¶ 50                                    A. First Interview

¶ 51     Sergeant John Daley and Investigator Richard Belcher first interviewed Leverson at approximately 8:45 p.m. on October 10. Daley read Leverson his *Miranda* warnings, and Leverson told the investigators that he had been sick with the flu and was not feeling well. During this interview, Leverson asked to call his mother, but police ignored his request:

> "A. Can I call, can I call my mom?
>
> Q. In a little while.
>
> A. 'Cause [inaudible]—
>
> Q. You're an adult right now so we're talking to you now."

¶ 52     Leverson was not given access to a phone.

¶ 53                                    B. Second Interview

¶ 54     Leverson spent roughly the next 19 hours in a holding cell. The next day, at about 12:15 p.m. and about 20 hours after his arrest, police interviewed Leverson again. This time, Detective Darryl Hope and Investigator Belcher conducted the interrogation. They first gave Leverson *Miranda* warnings again, then asked him what he had been doing the previous few days. Leverson denied involvement in the crime spree or knowing the participants. Both officers eventually left briefly before returning.

¶ 55     Leverson asked Detective Hope, "Can I have my phone call so I can call my lawyer?" Leverson told the detective he felt he was in a "bad situation" and still had not been allowed to make a phone call. Detective Hope denied Leverson's request, lying to him about his rights:

> "Q. When you're under investigation you don't get a phone call.
>
> A. You don't get a phone call under investigation?

Q. No."

¶ 56    Detective Hope eventually left the interrogation, prompting Leverson to yell out that he was "ready to like just go on ahead and tell you whatever."

¶ 57    Detective Hope returned a short while later and told Leverson that "we really gonna talk this time" before re-reading his *Miranda* warnings and asking more questions. Leverson continued to answer questions but began to visibly grow frustrated, putting his hands on his head and then later laying his head down on the table. After a few more exchanges, Detective Hope left Leverson alone in the interrogation room for 40 minutes.

¶ 58    Leverson eventually called out to use the restroom. When he returned, he asked the officer who escorted him, "Can I call my lawyer?" The unknown officer said, "Sure." Leverson followed up, "Can I use the phone?" The unnamed officer said, "Sure." But Leverson was never given access to a phone or provided an attorney.

¶ 59    Detective Hope returned a short while later and began questioning Leverson again. Leverson again asked Detective Hope if he could call his mother so that "she can call my lawyer[.]" Detective Hope asked Leverson if he wanted a lawyer present, to which Leverson replied that he did not need one, as he had done nothing wrong. Leverson later asked, "After I talk to you I can get my phone call?" Detective Hope replied, "After you talk to me I gotta go talk to my people, then we decide to give you the phone call."

¶ 60    In total, Leverson asked Detective Hope at least 16 times for a phone call during the second interview, the last time all but begging the officers:

"I just want my one phone call. That's all I ask for is my one phone call. *** And I told you I—I'll let you know, I'll tell you whatever you want to know. I'll tell you shit. I just need my one phone call. That's all I ask for is my one, I'm not asking for none of this

shit, I don't care about no food nothing, I will be hungry. I just want my one phone call. I just want my one phone call. My one phone call that's all I ask here."

¶ 61    Hope responded that "I'm gonna talk to my people" and "I'll see what I can do."

¶ 62                                    C. Third Interview

¶ 63    The third custodial interrogation began a few hours later, at 4:15 p.m on October 11, now 24 hours after police arrested Leverson. Again, Detective Hope led the questioning but did not give Leverson new *Miranda* warnings. As before, Leverson asked him numerous times if he could make a phone call, including near the beginning of this interview:

> "Q. Before all that like what they said about my phone call?
>
> A. They still working on that. They gotta talk to a state's attorney [inaudible].
>
> Q. They gotta talk to a state's attorney just for me to make a phone call?
>
> A. Yeah. Yeah."

¶ 64    Leverson was eventually allowed to call his sister and left the interrogation room for a short time to do so. After the call, police returned him to the interrogation room and resumed questioning him. Leverson told them, however, that his sister told him to "get something in writing or get a lawyer." Detective Hope then left the room, ending the interrogation.

¶ 65                                    D. Fourth Interview

¶ 66    The fourth interview, some 26 hours after the arrest, was uneventful. Police gave Leverson new *Miranda* warnings, and Leverson did not ask for an attorney, but he did not incriminate himself, either.

¶ 67                                    E. Fifth Interview

¶ 68    The calendar turned to October 12, and at 1:20 p.m., police interviewed Leverson for a fifth time, nearly 48 hours after his arrest. Detective Hope and Investigator Belcher were once

again present; Detective Hope read Leverson his *Miranda* warnings once again. Ten minutes into questioning, the following exchange occurred between Leverson and the two officers:

"A:     Okay, before I tell y'all names I just want a lawyer on the side of me present before I tell.

Q:     All right, we're done.

Q:     That's it.

Q:     Call him up.

A:     Call one up?

Q:     Yeah.

A:     Y'all can't call one for me?

Q:     No.

A:     Ya'll just said, you just said, read me my rights.

Q:     You get a lawyer in court.

A:     Oh only in court?

Q:     You're not—you're not, yeah, you're not that important to us that we gotta call a lawyer and have him come here for you ***."

¶ 69     When the interrogation ended, Hope returned Leverson to the holding cell and told him, "You know you going to wind up being the shooter."

¶ 70                                          F. Sixth Interview

¶ 71     The following morning, the police woke Leverson at 4 am, now some 60 hours after police arrested him. Officer Jack Daley brought Leverson into the interrogation room from the holding cell where Leverson had been sleeping. Officer Daley began by telling Leverson that he understood that Leverson wanted to talk to someone but had requested a lawyer. Leverson

responded, "I—I didn't I was just there asleep, I was tired." After a few more questions about whether he wanted to speak, Leverson told Officer Daley, "I wanted to go to sleep, sir, I'm tired, I'm hurt, and I'm very sick."

¶ 72     Officer Daley told Leverson that he'd take him back to the cell, but Leverson then asked the officer to just "read me my rights, I just want to know what's going on right now." Officer Daley read Leverson his *Miranda* rights again, and Leverson continued to maintain his innocence. Detective Hope returned to the room and joined in the questioning, but still, Leverson denied being involved in the crime spree.

¶ 73     At this point, both investigators—and later Leverson—grew visibly frustrated and, at various points, began yelling. Officer Daley told Leverson that his crimes were so serious that Leverson would "be on the front page in the newspaper as the number one villain in Chicago and the South Suburbs," and that "[t]hey're gonna say bring the death penalty back to Illinois this guy is a menace."

¶ 74     By now, the officers began to move physically closer to Leverson, still seated at one end of the table in the interrogation room, and surrounded him. Officer Daley told Leverson that he was going to Division 9 at the Cook County Jail—the maximum-security division—with other violent inmates, all of whom would watch him "walk around a square room with eight other motherf*** looking at you saying shake your ass." Officer Daley also told Leverson that he would be in prison for so long that his "dick won't work" when he got out, and that Leverson would never see his young son again.

¶ 75     The temperature continued to rise. Officer Daley insulted Leverson, telling him, "Don't act like a girl with that silly face *** you—you look like your [*sic*] gay right now that's not becoming to you." By now, Detective Hope also joined in and put his face directly in front of

Leverson's, yelling at him while only standing a few inches away. Leverson boiled over and began to yell back at the detectives. He shouted four times that he wanted a lawyer, and the officers ended the interrogation and returned Leverson to his holding cell.

¶ 76                                    G. Seventh Interview

¶ 77    About six hours later, still on October 13, Leverson told Officer Sandra Bankhead, a Dolton Police Department investigator (albeit not one working on this case) that he wanted to speak with detectives.

¶ 78    At about 2:15 p.m., now about 72 hours after police first arrested Leverson, Torrence Johnson, an investigator with the Illinois State Police, questioned Leverson with Hope present. Investigator Johnson read Leverson his *Miranda* rights from a pre-printed form, then had Leverson review, initial, and sign the sheet—something that had not happened up to that point.

¶ 79    In this interview, parts of which were played for the jury during Leverson's trial, Leverson admitted joining Eason and Flemming in the Jeep on Tuesday and Wednesday night. He said that Eason and Fleming came by and told Leverson that something had gone wrong when Eason and Fleming tried to rob someone named Chuck.

¶ 80    After Eason and Fleming picked Leverson up, they drove around until Eason found a man in a Pelle brand coat (presumably Gregory Harris) and robbed him at gunpoint. Eason took the man's bag, while Leverson took the Pelle coat. Eason and Leverson got back into the Jeep, he said, while Fleming drove them around the corner. There, they saw a man carrying lumber in his driveway (presumably Derrick Hampton). Leverson told Johnson that he and Eason got out of the Jeep and approached the man; when Eason threatened the man, the man responded, "You gotta shoot me." Leverson, realizing what was about to happen, began to run back to the Jeep.

¶ 81    Beyond that, Leverson admitted to being involved in the carjackings of the Lexus and

Chevy Equinox. Specifically, he said he was driving the Jeep when Eddie Fleming robbed a man and a woman, and that Fleming drove off in a truck (presumably the Equinox) while Kevin Eason stole a Lexus. Later, after the trio had dropped off the Jeep, Leverson got into the Lexus with Fleming and drove around until it crashed. Leverson later identified the gun police recovered as Eason's and admitted that, at one point during everything, Leverson had pointed it at someone while Eason rifled through the person's pockets.

¶ 82                                    XI. Pretrial and Trial Proceedings

¶ 83    Leverson challenged the use of his confession before trial. The trial court held a comprehensive hearing on whether he voluntarily waived his rights and confessed. At the hearing, the State entered into evidence video recordings of the seven interrogations. After reviewing the videos and hearing live testimony from a number of officers involved in the case, the trial court denied the motion to suppress. The court ruled that Leverson had invoked his right to speak to an attorney during his fifth interview but found that Leverson had initiated further contact with police and then knowingly and intelligently waived his rights before speaking to Investigator Johnson in the seventh and final interview.

¶ 84    Leverson later elected to have a jury decide his fate. During the jury trial, portions of this seventh interrogation were played, and a transcript of those portions was admitted into evidence. During deliberations, the first thing the jury requested was the transcript of Leverson's confession, which they were given. After further deliberations, the jury convicted Leverson of all charges. The court sentenced him to 72 years in prison. Leverson now appeals.

¶ 85                                           ANALYSIS

¶ 86    On appeal, Leverson makes two arguments. First, he renews his challenge to the use of his confession, arguing that he did not knowingly and intelligently waive his *Miranda* rights

before the seventh interview and that his confession was involuntary. Additionally, he argues that his 72-year sentence is unconstitutional or, alternatively, excessive.

¶ 87                                    I

¶ 88    We begin with Leverson's challenge to his confession. He raises two claims that overlap and interrelate but, in fact, are distinct. First, his confession was the product of a *Miranda* violation, in that he invoked his right to counsel and did not validly re-initiate conversation with the police, and even if he did validly re-initiate communications with the police, his subsequent waiver of his *Miranda* rights was not knowing and intelligent. See *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-45 (1983); *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Miranda v. Arizona*, 384 U.S. 436, 455-67 (1966); *People v. Woolley*, 178 Ill. 2d 175, 198-202 (1997).

¶ 89    His second argument is that the conduct of the police was sufficiently coercive as to render his ultimate confession involuntary, violating his due-process rights. It is on this ground that we decide this appeal.

¶ 90    Leverson raised this challenge to the voluntariness of his confession pretrial and post-trial and thus preserved it for our review. *People v. Salamon*, 2022 IL 125722, ¶ 59. As noted, the court held an extensive suppression hearing with factual findings and legal conclusions. We largely defer to the trial court's factual findings; we will overturn them only if they are against the manifest weight of the evidence. *In re D.L.H.*, 2015 IL 117341, ¶ 46. But we reserve for *de novo* review the ultimate question of whether the confession should be suppressed. *Id.*

¶ 91    The due-process and self-incrimination clauses of the fifth amendment to the United States Constitution, applied to the states via the fourteenth amendment, prohibit the admission of an involuntary confession. U.S. Const., amends. V, XIV, § 1; *Salamon*, 2022 IL 125722, ¶ 76. The test for whether a confession is voluntary is whether the defendant made the statement freely

and without compulsion or inducement of any sort, or if the defendant's will was overborne at the time he confessed. *People v. Slater*, 228 Ill. 2d 137, 160 (2008). Simply put, we ask whether the confession is the "product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973).

¶ 92    Coercion by law enforcement is a prerequisite to finding a confession involuntary. *Salamon*, 2022 IL 125722, ¶ 83. Coercion can be psychological as well as physical. *Id.*; see *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991); *Miranda*, 384 U.S. at 448. It may include refusing to allow a suspect to contact family or an attorney; threatening a suspect with the loss of custody of her children; and prolonged *incommunicado* interrogation. *Salamon*, 2022 IL 125722, ¶¶ 83, 103; *People v. Ballard*, 206 Ill. 2d 151, 176 (2002).

¶ 93    Beyond that, we consider the totality of the circumstances in determining whether a confession was voluntary. *Salamon*, 2022 IL 125722, ¶ 81. Relevant factors include the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning. *Id.* We consider the legality and duration of the detention, the duration of the questioning, the provision of *Miranda* warnings, and any physical or mental abuse by police, including the existence of threats, promises, or lies. *Id.*; *People v. Willis*, 215 Ill. 2d 517, 533 (2005); see *Schneckloth*, 412 U.S. at 226.

¶ 94    At the time of questioning, Leverson was 19 years old. He was born crack-addicted. His mother spent time in prison when he was a child. He has largely untreated mental-health issues, including diagnoses of bipolar disorder, manic depression, attention deficit hyperactivity disorder, and schizophrenia, for which on occasion he received psychotropic drug therapy. He dropped out of high school after the tenth grade.

¶ 95     His personal background aside, we next consider the police conduct during the 72-hour interrogation process. For the reasons we explain below, we have no hesitation in concluding that Leverson's confession was involuntary. We base our conclusion on three factors in particular.

¶ 96                                                      A

¶ 97     We begin with the *Miranda* violations, a critical factor in a voluntariness analysis. See *Salamon*, 2022 IL 125722, ¶ 81; *Schneckloth*, 412 U.S. at 226. A brief review of that doctrine is in order.

¶ 98     In *Miranda*, 384 U.S. at 444, the United States Supreme Court prohibited the use of confessions in court unless the police had first warned the suspect that he had the right to remain silent, that any statement he made may be used against him, and that he had the right to speak to an attorney and have that attorney present during a custodial interrogation. See *Salamon*, 2022 IL 125722, ¶ 77. The warnings are meant to combat the " 'police-dominated atmosphere' " of an interrogation, where the suspect is subjected to the " 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' " *Id.* (quoting *Miranda*, 384 U.S. at 467).

¶ 99     A suspect may waive his *Miranda* rights, as long as that waiver is knowingly and intelligently made, with a basic understanding of those rights, what they encompass, and the consequences of waiving them. *People v. Braggs*, 209 Ill. 2d 492, 514-15 (2003).

¶ 100    To invoke the right to counsel, "the suspect must unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459 (1994). If the suspect does so at any time before or during a custodial interrogation, all questioning of the suspect must cease. *Edwards*, 451 U.S. at 485. A suspect may, of his own accord and not via coercion, re-initiate conversation with the police and waive his *Miranda* rights—again, provided that waiver is knowing and intelligent. *Id.* at 484-85.

¶ 101   In our view, Leverson unambiguously invoked his right to counsel at least four different times during the seven custodial interrogations. The first was during the second interrogation, almost 22 hours after Leverson's arrest. Leverson asked Detective Hope, "Can I have my phone call so I can call my lawyer?" See *People v. Coleman*, 2021 IL App (1st) 172416, ¶ 84 (defendant who asked, "Can I call my lawyer?" invoked right to counsel); *People v. Schuning*, 399 Ill. App. 3d 1073, 1075, 1089 (2010) (defendant's request to "use the telephone to call his attorney" was unambiguous invocation of right to counsel); *People v. Eichwedel*, 247 Ill. App. 3d 393, 398 (1993) (defendant's request to call his lawyer invoked right to counsel).

¶ 102   Detective Hope responded, "When you're under investigation you don't get a phone call." Obviously, that statement was false; Leverson had an unquestioned constitutional right to counsel, not to mention a statutory right to a phone call to contact either counsel or family. See 725 ILCS 5/103-3(a) (West 2012). Nor did the detectives end their questioning at that moment; they continued to interrogate him unabated, despite their obligations to cease the interrogation immediately. See *Edwards*, 451 U.S. at 485.

¶ 103   The second time occurred when Leverson spoke to an unidentified officer during a break—perhaps hoping for more success with a new face—asking, "Can I have a lawyer?" That is as unambiguous as a request can be. The officer responded, "Sure," but nothing came of it. The fact that this officer was not the one interrogating Leverson is of no constitutional import; the knowledge of one officer is imputed to the other in this context. See *Arizona v. Roberson*, 486 U.S. 675, 687 (1988) ("we attach no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel"); *Schuning*, 399 Ill. App. 3d at 1081 n.1 (2010).

¶ 104   The third unambiguous invocation occurred nearly 48 hours after his arrest, during the

fifth interview, after Leverson had spent the last 18 hours in a holding cell. Leverson told the detectives, "[B]efore I tell y'all names I just want a lawyer on the side of me present before I tell." A textbook invocation if there ever was one, as the State concedes (and conceded below). The detectives denied the demand in two ways, telling Leverson that "[y]ou get a lawyer in court" and "you're not that important to us that we gotta call a lawyer."

¶ 105    The detectives did cease questioning at that moment and for the next 12 hours. They did not, however, make any effort to provide Leverson a public defender or a phone call to secure counsel of his choice.

¶ 106    About 60 hours after Leverson's arrest, detectives awoke Leverson at 4 am for his sixth interview, where Leverson invoked his right to counsel for (at least) the fourth time. After a heated exchange we detailed above, Leverson repeated four times, "I want a lawyer."

¶ 107    The detectives ceased questioning at that moment; they were already terminating the interview when Leverson demanded counsel. Another six hours passed—again, during which time the detectives made no attempt to honor Leverson's request for counsel.

¶ 108    Over the span of 66 hours, Leverson unequivocally requested counsel at least four different times. The police wholly dishonored that right through lies, obfuscation, or delay, never attempting to provide him counsel and continuing to question him throughout.

¶ 109                                          B

¶ 110    Even more frequent than his request for counsel was Leverson's request for a phone call to contact either counsel or his family. As we noted above, in Illinois, a suspect who is taken into police custody "shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner. Such communication shall be permitted within a reasonable time after arrival

at the first place of custody." 725 ILCS 5/103-3(a) (West 2012).

¶ 111    The version of the statute in effect at the time did not define a "reasonable time." Later amendments to the statute have specified that an arrestee must be given an opportunity to make a phone call no later than 3 hours after arriving at the first place of detention. 725 ILCS 5/103-3.5(a) (West 2022). Regardless of what was in effect at the time of Leverson's confession, our supreme court recently noted that, even under the old version in effect here, "the legislature intended that a suspect held in custody must be permitted to communicate with an attorney and family members within a relatively short period of time—such as a couple of hours." *Salamon*, 2022 IL 125722, ¶ 99.

¶ 112    Our supreme court in *Salamon* recently held that, though section 103-3(a) does not specify a remedy for noncompliance, "an unwarranted delay in providing the simple expedient of a telephone call takes on significant importance in evaluating the voluntariness of an inculpatory statement made after an extended period of *incommunicado* detention." *Id.* ¶ 128.

¶ 113    In that decision, Salamon, a murder suspect, demanded a lawyer when detectives picked him up and repeated that demand at the station house. *Id.* ¶¶ 8-9. Police held him in an interrogation room for 24 hours without a phone call or counsel. After his requests for counsel and a phone call were ignored, he waived his *Miranda* rights and submitted to questioning, ultimately confessing. *Id.* ¶¶ 10-11. Our supreme court, leaning heavily on the fact that the defendant was held *incommunicado* for 24 hours after having asked to speak to an attorney and denied his statutory right to a phone call, found his confession involuntary. *Id.* ¶ 119.

¶ 114    The officers' violations of section 103-3(a) here are more egregious. Leverson repeatedly asked—as many as 15 or 20 times—to make a phone call to his lawyer or family. The same 24 hours passed as in *Salamon* before Leverson was allowed a single phone call to his sister. For the

remaining 48 hours, he was held *incommunicado*. His requests to the Dolton police were met with lies and delay tactics. This persistent and blatant violation of section 103-3(a) weighs heavily in favor of a finding of involuntariness.

¶ 115                                                                     C

¶ 116    The final factor we highlight is the length of Leverson's overall detention. An arrest is a seizure, as is detention in a police station. The fourth amendment requires a prompt probable-cause hearing for a suspect arrested, as here, without a warrant. *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). The Supreme Court set an outer boundary for that prompt hearing at 48 hours. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). Our state law in effect at the time required that a suspect be taken before a judge "without unnecessary delay." 725 ILCS 5/109-1(a) (West 2012). "When a probable cause determination is not made within 48 hours of arrest, the burden shifts to the government to show the existence of a *bona fide* emergency or other extraordinary circumstances to justify the delay." *People v. Chapman*, 194 Ill. 2d 186, 215 (2000); see *McLaughlin*, 500 U.S. at 57; *People v. Mitchell*, 366 Ill. App. 3d 1044, 1049 (2006).

¶ 117    Detention in a station house beyond 48 hours does not result *per se* in the exclusion of a confession but remains a factor in determining the voluntariness of a confession. *Willis*, 215 Ill. 2d at 533; *Chapman*, 194 Ill. 2d at 214. Prolonged detention between arrest and confession " ' "may serve to amplify the coercion latent in a custodial setting, particularly when there are other indicia of coercion." ' " *Mitchell*, 366 Ill. App. 3d at 1054 (quoting *People v. Ollie*, 333 Ill. App. 3d 971, 985 (2002), quoting *People v. Lekas*, 155 Ill. App. 3d 391, 414 (1987)).

¶ 118    Leverson does not raise a *Gerstein* violation here but does argue that the unreasonable delay was a factor contributing to his involuntary confession. Leverson was held for over 72 hours without an appearance before a judge. The State has offered no justification, and the record

admits of none, for holding Leverson well beyond 48 hours. This alone is not a dispositive fact, as we have emphasized, but rather a factor contributing to a finding of involuntariness.

¶ 119                                                              D

¶ 120    All these factors led up to the moment, 66 hours after his arrest, that Leverson informed an officer in the Dolton Police Department that he was ready to talk. The trial court found that, in doing so, Leverson reinitiated contact with the police, thus allowing the police to interrogate him again, notwithstanding his invocation of the right to counsel six hours earlier. See *Edwards*, 451 U.S. at 484-85. We defer to the trial court's factual finding that Leverson reinitiated contact; that finding is not against the manifest weight of the evidence. It is likewise true that the police then gave Leverson fresh *Miranda* warnings and that he verbally and in writing waived those rights.

¶ 121    But we wholly disagree that anything Leverson did at that point was voluntary. By then, nearly three calendar days since his arrest, the police had made it clear to him that he would not be given counsel, he would not be allowed access to his family, and he would remain in the Dolton police station until he confessed. They might give him *Miranda* warnings again, but they had already done so several times, and those prophylactic words had proven meaningless. As in *Salamon*, 2022 IL 125722, ¶ 104, on facts less egregious than here, "the police demonstrated to [Leverson] that they could hold him *incommunicado* for as long as it took for him to confess."

¶ 122    The right to phone calls may be statutory, but our supreme court emphasized the link between the right to phone calls in section 103-3(a) and the constitutional right to counsel:

> "The State also argues that the failure to comply with section 103-3(a) does not require suppression of a custodial statement because the statute does not impose any consequence or remedy for violation of its terms. But such a rule would undermine the purpose of the provision and nullify the legislature's intent to enable a suspect in custody

to exercise the right to counsel while in custody. Acceptance of the State's argument would create the anomalous situation where police officers are required by *Miranda* to warn a suspect of the right to counsel but then could prevent the suspect from exercising that right by denying him access to a telephone—which is precisely what occurred in this case." *Id.* ¶ 115.

It is precisely what occurred in this case, too, except on a far larger scale than in *Salamon*.

¶ 123   We would also respectfully submit that what was lost in the trial court's analysis is that, in addition to the three other times he did so, Leverson unequivocally invoked his right to counsel in his sixtieth hour of detention during the fifth interview—shouting four times, "I want a lawyer"—which both the State and the trial court acknowledged as a valid invocation. Yet nothing happened for the next six hours. The police easily could have given him access to a phone at any point. Or they could have provided him a public defender, who for all we know was already stationed there in Dolton or, if not, could have been summoned. If Leverson were not already convinced that the police would not honor his right to counsel after denying it on three previous occasions, what was he to think as he sat in his holding cell for the next six hours after demanding a lawyer repeatedly?

¶ 124   The repeated violations of *Miranda*, the denial of his repeated requests for phone calls, and the length of time during which these violations occurred lead us to find Leverson's inculpatory statement to the police to be involuntary, in violation of the fifth and fourteenth amendments. His confession should have been suppressed. Its admission at trial was error.

¶ 125                                        II

¶ 126   To convince us to uphold Leverson's convictions despite this constitutional error, the State carries the burden of demonstrating that the error was harmless beyond a reasonable doubt.

*People v. Mitchell*, 152 Ill. 2d 274, 327-38 (1992). It is no small burden, as our supreme court has long recognized that " 'a confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable.' " *People v. Simpson*, 2015 IL 116512, ¶ 36 (quoting *People v. R.C.*, 108 Ill. 2d 349, 356 (1985)); see *People v. Patterson*, 154 Ill. 2d 414, 436 (1992) ("a confession may be the most probative and damaging evidence that can be admitted against a defendant" (internal quotation marks omitted)).

¶ 127   For this reason, our supreme court recently reminded us that the " 'admission of an unlawfully obtained confession rarely is harmless error.' " *Salamon*, 2022 IL 125722, ¶ 122 (quoting *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988)).

¶ 128   The State must prove, beyond a reasonable doubt, that the result would have been the same absent the error. *Id.* ¶ 123. The reviewing court must review the facts of the case and the evidence and determine the effect that the unlawfully obtained evidence may have had on that evidence and the conduct of the defense at trial. *St. Pierre*, 122 Ill. 2d at 114. In doing so, courts (1) focus on the error to determine whether it might have contributed to the conviction, (2) examine the other evidence in the case to see if it overwhelmingly supports the conviction, and (3) determine whether the improper evidence is merely cumulative of other properly admitted evidence. *Salamon*, 2022 IL 125722, ¶ 121.

¶ 129   Under a deferential sufficiency-of-the-evidence standard, where the burden is on the defendant and we interpret the evidence in the light most favorable to the State, we would find that the evidence was sufficient to convict Leverson of each crime. But the State has not carried its burden of showing that the evidence was overwhelming absent the confession; it has not shown that the confession did not contribute to the convictions; it has not shown beyond a reasonable doubt that the outcome would have been the same absent the confession.

- 25 -

¶ 130   The first of the series of crimes, occurring in rather rapid succession, were the armed robbery of Gregory Harris at roughly 10 pm, followed quickly by the murder of Derrick Hampton very close in proximity, followed closely in time and proximity by the armed robbery of Ravetta Moore. These three crimes were linked not only in time and proximity but by the fact that they were perpetrated by two men, one of whom was Kevin Eason; they all involved the use of a Jeep; and one of the fruits of the first armed robbery (Gregory Harris's stolen ID card) was found at the scene of the later (Ravetta Moore) armed robbery.

¶ 131   But the State's evidence that this other man was Leverson was not overwhelming. Ravetta Moore did not identify him. There were no eyewitnesses to the murder of Derrick Hampton, only surveillance video that did not conclusively show Leverson as the accomplice.

¶ 132   As for the Gregory Harris robbery that began the crime spree, Harris himself did not identify Leverson in court as the perpetrator. True, he identified Leverson at the *station house* as the unarmed man who robbed him and who got into the passenger side of the Jeep afterward. But he recanted at trial, testifying that his station-house identification was invalid, that he only made the identification because the police would not release his property to him until he did so. (An investigator with Dolton denied Harris's account of the events at the station house.)

¶ 133   In the context of sufficiency challenges, we have often noted that the law views recanted identifications with a skeptical eye. But this is not a sufficiency challenge. Harris's recanted station-house identification was the only untainted evidence that Leverson played any role in these three crimes. That is not enough to constitute overwhelming evidence of guilt.

¶ 134   In his confession, however, Leverson implicated himself in those crimes. He admitted to participating in the armed robbery of Gregory Harris and in the murder of Derrick Hampton. He put himself inside the Jeep and put himself next to his accomplice, Kevin Eason, from the start.

¶ 135    That brings us to the carjacking of the Lexus and Chevy Equinox at around 11 pm. The carjacking victim testified that he and his girlfriend were accosted by two men—one was Kevin Eason, the other unidentified. And the Jeep was involved as well. One assailant drove away the Chevy Equinox, another the Lexus, and a third drove away the Jeep—for the first time conclusively showing that there were at least three people involved in the crime spree.

¶ 136    There was no particular evidence linking Leverson to those carjackings. But again, he confessed to his role in those crimes. He confessed to driving the Jeep away from the crime scene. As the State said in rebuttal closing argument: "[H]e puts himself there [at the carjacking]. He gets everything right." And Leverson confessed to later getting into the Lexus with Kevin Eason and remaining inside the Lexus until the car crash following the police chase.

¶ 137    Then there was the series of crimes that were committed by the assailants while driving the Lexus. Those included the armed robbery of Willie Douglas, the attempted armed robbery of Angela Feaster, and the armed robbery of Phillip Neal, followed by the police chase that resulted in the crashing of the Lexus and the escape of the two individuals inside that vehicle.

¶ 138    Both Angela Feaster and Phillip Neal identified Kevin Eason as one of the two offenders, but neither identified Leverson as the other offender. At the time of the incident, Willie Douglas told the police that he did not see the face of the passenger in the Lexus well enough to make an identification. Three weeks later, he identified Leverson in a photo array as the passenger in the Lexus who had robbed him. Notably, for reasons unclear to us, Douglas was not asked to make an in-court identification of Leverson at trial.

¶ 139    Two pieces of forensic evidence were recovered at the scene of the Lexus crash. One concerned the weapon used in each of these offenses, which the police recovered inside the Lexus. The State's DNA expert testified that Leverson could not be excluded as a source of the

DNA. The expert also conceded that it was impossible to know when a person's DNA is deposited on an object.

¶ 140   The other was the passenger airbag in the Lexus that would have deployed at the time of the crash following the police chase. In the DNA expert's opinion, the major male DNA profile on the passenger airbag was a match to the DNA profile of Leverson. That DNA evidence was the State's strongest evidence, as it put Leverson in the Lexus at the time of the crash. What was less clear (absent the confession) is when Leverson got inside that Lexus; the evidence showed that three individuals were participating at that point in the crime spree, with three separate cars.

¶ 141   Perhaps the fact that Leverson was in the Lexus at *any* time that night would be enough, by itself, to convict him on an accountability theory of some of these crimes—the ones committed while driving the Lexus. But the DNA evidence from the airbag would have done nothing to prove Leverson's guilt regarding the crimes committed before the Lexus carjacking while driving the Jeep; absent Leverson's confession, the State had only a recanted confession from Harris to prove that initial string of crimes. The DNA evidence related to the gun was certainly evidence that Leverson, at some point during that night, may have handled the weapon. Relevant and helpful to the State, absolutely—but overwhelming by itself, no.

¶ 142   The confession, on the other hand, put Leverson in the Jeep and in cahoots with Kevin Eason from the start—the only evidence, other than Harris's recanted identification, that did so. And the confession did more than establish that Leverson was inside the Lexus at *some* point in the evening—it placed him in the Lexus at the beginning of that portion of the crime spree and then throughout the remainder of it.

¶ 143   That was undeniably of great value to the State in convicting Leverson of all eight crimes in the spree. In a case where one of the offenders appeared to be involved throughout, based on

witness identifications (Kevin Eason), but the victims mostly struggled to identify a second offender—which could have been either Leverson or Flemming, if not someone else—Leverson's confession wrapped up this loose end in a tidy bow. Whether he physically participated in each and every crime, Leverson's confession put him in the Jeep at all times during that portion of the crime spree and in the Lexus throughout the remainder of the spree, rendering him guilty under a theory of accountability for all eight crimes.

¶ 144   The State did not carry its burden of proving, beyond a reasonable doubt, that the State could have obtained all these convictions absent the tainted confession. The confession unquestionably contributed to the verdicts in a meaningful way. This is not the "rare" case where the admission of an involuntary confession was harmless error. *Id.* ¶ 122; *St. Pierre*, 122 Ill. 2d at 114. Leverson's convictions must be reversed.

¶ 145                                    III

¶ 146   We understand that the Dolton police were trying to solve a series of violent crimes, and that they had reason to believe that Leverson was one of the offenders. Their ends were commendable, but their means were anything but. If the fifth amendment and *Miranda* do not apply to everyone, they do not apply to anyone.

¶ 147   As we remand this case for a new trial, we need not address Leverson's argument that his sentence is excessive. Nor is there a double-jeopardy bar to retrial, as the evidence, taken in the light most favorable to the State, was sufficient to convict defendant beyond a reasonable doubt.

¶ 148                              CONCLUSION

¶ 149   Defendant's convictions are reversed. The cause is remanded for a new trial.

¶ 150   Reversed and remanded.

***People v. Leverson*, 2024 IL App (1st) 211083**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 12-CR-20961, 13-CR-20552(02); the Hon. Michele McDowell Pitman, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Kelly Anne Burden, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Joseph A. Alexander, John E. Nowak, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |