2026 IL App (1st) 240300

No. 1-24-0300

Opinion filed March 20, 2026

FIFTH DIVISION

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of Cook County, |
| Plaintiff-Appellee, | ) | Criminal Division. |
| | ) | |
| v. | ) | No. 18 CR 6009201 |
| | ) | |
| JOHN DOE, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE MITCHELL delivered the judgment of the court, with opinion.
Justice Mikva and Justice Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant John Doe appeals his conviction and sentence for the first degree murder of his former employer, Luis Pena. 720 ILCS 5/9-1(a)(1) (West 2016). Defendant raises the following issues on appeal: (1) whether there was sufficient evidence for a rational jury to find defendant committed first degree murder and to reject defendant's claims of self-defense and imperfect self-defense; (2) whether the circuit court erred in denying defendant's motion to suppress statements because detectives denied defendant's repeated requests to speak to his family; (3) whether defendant's counsel was ineffective for failing to move to redact an electronically recorded interview, or to seek a limiting instruction, where detectives commented on defendant's credibility; (4) whether defendant's counsel was ineffective for not requesting a jury instruction on serious provocation to reduce defendant's conviction to second degree murder where defendant

testified that Pena used a slur against defendant; and (5) whether the circuit court abused its discretion by imposing a 45-year prison sentence. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      On December 30, 2016, Chicago police found Luis Pena dead in a trailer in the trucking yard where he ran his company, LL Pena Trucking, on the southwest side of Chicago. Stabbed 17 times, Pena's skull had also been fractured open. Over a year later, a grand jury indicted John Doe, a former employee, on charges of first degree murder, armed robbery, and felony murder.

¶ 4      Defendant's arrest and indictment came after Chicago police detectives traveled to New Orleans to interview defendant where he had applied for a job with the New Orleans Police Department. Invited to the interview room on the pretext of discussing his job application, the Chicago detectives soon began to inquire about Pena's death. Detectives read defendant his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)). They showed defendant still photos taken from a surveillance camera that placed defendant at the trucking yard on the morning of Pena's death. Defendant explained that he quit working for Pena after a dispute arose when defendant abandoned a truck in Wisconsin after it broke down. In the course of the interview, defendant's explanations evolved from an outright denial to an eventual admission that he killed Pena. Defendant maintained he acted in self-defense after Pena attacked him with a knife during an argument over defendant returning to work.

¶ 5      Defendant later moved to suppress his statements from the interview and contended that they were involuntary because the detectives denied defendant's requests to call family members during the approximately two-and-a-half-hour interview. After reviewing the electronically

recorded interview and hearing testimony from one of the detectives, the circuit court concluded that defendant's statements were voluntary and denied the motion to suppress.

¶ 6    At trial, the State introduced evidence that defendant entered the trailer with intent to rob Pena. Pena Trucking's secretary testified that she deducted money from defendant's final paycheck at Pena's direction. Pena's wife testified she withdrew $3,000 in cash and gave it to Pena the day before he was killed and that he had it with him when he left for work on December 30. Only $4.71 was recovered from Pena's person by the medical examiner. Surveillance footage from the trucking yard showed defendant arrived there early in the morning on December 30. He parked his car on the street rather than in the yard. He wore a hooded sweatshirt and a face mask and evaded co-workers by approaching along the outer perimeter of the property. Defendant walked to a truck, where he retrieved a broom. Another video showed him carrying broom and a small white object. Defendant testified that he normally parked in the trucking yard, not on the street, and that he entered through a hole in the fence. He confirmed that he had been in the trailer with Pena before the video of him retrieving the broom and again before the second video of him leaving with the broom.

¶ 7    The State also offered the electronically recorded interview with detectives in which defendant admitted that he intended to confront Pena about his paycheck that day, that he killed Pena by stabbing him repeatedly and hitting him in the head with a hammer, and that he took money from Pena's pocket afterward. The recording also included detectives' statements expressing doubt about defendant's self-defense narrative and asserting that he went to the trucking yard to rob Pena.

¶ 8    The medical examiner testified that Pena suffered 17 sharp force injuries. According to the medical examiner, the blows fractured Pena's skull, resulting in injuries "capable of causing death," though the ultimate cause of death was "multiple injuries due to assault."

¶ 9    After the State rested, defendant testified. He recounted that while working at LL Pena, his tires had been slashed, and his car window had been cracked. His car had been blocked in multiple times, and he once encountered men sitting on it. He explained that he picked up his last check from Pena Trucking in late November or early December, and he returned on December 30 to pick up a broom from his truck. He said he parked outside to avoid potholes in the trucking yard and entered surreptitiously to avoid a coworker with whom he had a "run-in" in the past. Defendant said that he spoke briefly with Pena before retrieving the broom from the truck, and then he re-entered the trailer, where Pena informed defendant that the company had a new contract and he wanted defendant to return to work. Defendant declined, explaining that he had been discriminated against while working at Pena Trucking and was not paid his last check. According to defendant, Pena said defendant was "lucky he gave a 'f****t' a job" and called defendant an "abomination." Defendant testified that Pena shoved him and, during the altercation that followed, pulled a small folding knife from his pocket, said he was going to kill defendant, and tried to stab defendant. After a struggle, defendant used the knife to stab Pena and then hit Pena twice in the head with a hammer. Defendant denied taking any money from Pena.

¶ 10    The jury found defendant guilty of first degree murder and that the killing exhibited exceptionally brutal or heinous behavior indicative of wanton cruelty. The jury acquitted defendant of felony murder. The circuit court sentenced him to 45 years' imprisonment, and this timely appeal followed. Ill. S. Ct. R. 606 (eff. Dec. 7, 2023).

¶ 11                              II. ANALYSIS

¶ 12                         A. Sufficiency of the Evidence

¶ 13    Defendant first raises a sufficiency challenge in connection with his claim of self-defense: he argues that the State failed to disprove any element of self-defense beyond a reasonable doubt where defendant consistently asserted that Pena was the initial aggressor and evidence showed Pena kept weapons in his office. Together with defendant's testimony that Pena used homophobic slurs and that defendant had experienced harassment due to his sexuality while working at Pena Trucking, defendant contends the evidence supported a conclusion that defendant reasonably believed in the need for deadly force. The State argues a rational jury could have found defendant was the initial aggressor and that defendant did not actually believe Pena posed a danger requiring the use of deadly force where his statements in his interview and other circumstantial evidence undermined his trial testimony.

¶ 14    When reviewing the sufficiency of the evidence as to a self-defense claim, the question is "whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that defendant did not act in self-defense." *People v. Lee*, 213 Ill. 2d 218, 225 (2004). "[A] reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *People v. Wright*, 2017 IL 119561, ¶ 70. We will overturn a conviction only if "the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Jones*, 2023 IL 127810, ¶ 28.

¶ 15    A defendant commits first degree murder when he kills another without lawful justification

intentionally, knowingly, or during the commission or attempted commission of a forcible felony other than second degree murder. 720 ILCS 5/9-1(a)(1)-(3); *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 26. Under the Criminal Code of 2012, a person "is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2016). Once a defendant raises self-defense, the State bears the burden to prove, "in addition to the elements of first degree murder, that the use of force was not justified beyond a reasonable doubt." *People v. Mujkovic*, 2022 IL App (1st) 200717, ¶ 26. Specifically, the State must negate at least one of six elements:

> "(1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." *People v. Jeffries*, 164 Ill. 2d 104, 128 (1995).

¶ 16    Here, the State's evidence contradicted defendant's assertion that Pena was the initial aggressor. Defendant testified that he went to the trucking yard to retrieve a broom and that Pena drew a knife during their argument. In response, the State offered evidence that defendant felt Pena had wrongfully withheld pay and entered the trailer with the intent to confront Pena. Surveillance video depicted defendant attempting to avoid detection as he approached the trailer. He wore a hoodie and mask, carried a taser, parked his car on a nearby street, and entered through a hole in the fence. Pena's wife testified that she gave her husband approximately $3,000 in cash the day before and that he had it with him the day he was killed, but the medical examiner only recovered $4.71 from Pena's body. During his interview, defendant admitted that he went to the trucking yard to "confront [Pena] about not paying me for the breakdown and to get the broom" and that he

took money from Pena's pocket.

¶ 17    As to the altercation itself, defendant testified that Pena pushed him, and once the two were physically fighting, pulled out a small folding knife. The State offered testimony from Pena's wife that after Pena's death, the two knives Pena kept in his office were still where he normally kept them. When asked on cross-exam whether Pena sometimes carried a knife on him as well, she said he did not. The knife used to kill Pena was not recovered.

¶ 18    Defendant also admitted that he hit Pena with the hammer after Pena, disarmed, had fallen to the floor and was trying to get back up. See *People v. Berry*, 175 Ill. App. 3d 420, 426 (1988) ("[S]elf-defense is no justification for the use of deadly force once the antagonist has been subdued or is lying helpless on the ground."). Defendant testified about a violent struggle so severe as to justify defendant stabbing Pena multiple times and fracturing his skull, but the State offered surveillance video of defendant exiting the scene without any visible injuries. He admitted in his recorded interview that he disposed of the hammer in a trash can, left the scene and, later, left the jurisdiction without alerting authorities. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 59 ("Evidence of flight, as well as discarding of the weapon, is competent circumstantial evidence that refutes the theory that defendant acted in self-defense.").

¶ 19    Moreover, the jury observed defendant change his story throughout the recorded interview with detectives. He first denied seeing Pena the day he was killed; he said he entered the trucking yard through the main gate. Then, after admitting he stabbed Pena, he claimed not to remember hitting him with a hammer. He said the white object that he carried away from the trailer was piece of plastic inadvertently stuck to the broom; he denied taking any cash. Defendant reversed course on each of these contentions when confronted with contrary evidence during the recorded

interview.

¶ 20    Defendant's testimony was consistent about the fact that Pena was the aggressor and that defendant feared for his life. But "[w]here a defendant's statement is contradicted by the facts and circumstantial evidence, the trier of fact need not believe it ***." *People v. Batchelor*, 171 Ill. 2d 367, 376-77 (1996). We will not substitute our judgment for that of the jury "simply because the evidence is contradictory." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Viewed in the light most favorable to the State, the evidence supported the jury's finding that defendant did not stab and bludgeon Pena in fear of unlawful force threatened against him, and thus, we conclude that a rational jury could find defendant did not act in self-defense.

¶ 21    In the alternative, defendant argues that this court should reduce his conviction to second degree murder because he had a genuine if unreasonable belief in the need for deadly force. Under the Criminal Code of 2012, first degree murder can be reduced to second degree if a jury finds the presence of a mitigating factor. 720 ILCS 5/9-2(a) (West 2016). Relevant here, "[o]ne factor in mitigation, imperfect self-defense, occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable." (Internal quotation marks omitted.) *People v. Guy*, 2025 IL 129967, ¶ 42; 720 ILCS 5/9-2(a)(2). "[T]he burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence ***." 720 ILCS 5/9-2(c). For the same reasons a jury could rationally conclude beyond a reasonable doubt that defendant did not believe in the need for deadly force, it is equally clear that a rational jury could have found defendant failed to establish that belief by a preponderance of the evidence.

¶ 22                                      B. Motion to Suppress

¶ 23 Defendant argues the circuit court erred in denying his motion to suppress his recorded statements to the detectives because they denied defendant's requests to call his family during the interview and lured defendant to the station on the pretext of a job interview. The State argues the motion was properly denied where defendant waived his *Miranda* rights and his statements were voluntary under the totality of the circumstances.

¶ 24 A circuit court's decision on a motion to suppress is subject to a two-part standard of review. *People v. Salamon*, 2022 IL 125722, ¶ 75. Factual findings will only be reversed if they are against the manifest weight of the evidence. *Id.* We review the legal question of whether a confession was involuntary and must therefore be suppressed *de novo. Id.* ¶¶ 75-76.

¶ 25 A defendant's inculpatory statements may be admitted into evidence in a criminal trial only if voluntary. U.S. Const., amends. V, XIV; *In re D.L.H., Jr.*, 2015 IL 117341, ¶ 58. "The test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession." (Internal quotation marks omitted.) *People v. Hughes*, 2015 IL 117242, ¶ 31. The inquiry is based on the "totality of the circumstances." *Salamon*, 2022 IL 125722, ¶ 81. Considerations include "the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning." *Id.* Additionally, courts consider "the legality and duration of the detention, the duration of the questioning, the provision of *Miranda* warnings, and any physical or mental abuse by police, including the existence of threats or promises." *Id.*

¶ 26 Under *Miranda v. Arizona*, 384 U.S. 436 (1966), a defendant's inculpatory statements in a custodial interview are inadmissible in the State's case-in-chief "unless the prosecution

demonstrates that the suspect has been warned of the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney." *Salamon*, 2022 IL 125722, ¶ 77. Any waiver must be knowing and voluntary. *Id.* The Illinois Code of Criminal Procedure of 1963 also requires that suspects be allowed to communicate with an attorney and members of their family:

> "Persons who are arrested shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner. Such communication shall be permitted within a reasonable time after arrival at the first place of custody." 725 ILCS 5/103-3(a) (West 2016) (repealed by Pub. Act 102-694, § 25 (eff. Jan. 7, 2022)).

However, the statute does not have an exclusionary rule. *Salamon*, 2022 IL 125722, ¶¶ 97, 115. In other words, even if the suspect was deprived of his right to make phone calls within a reasonable time, his subsequent statements are not necessarily suppressed. Rather, the violation should be "considered in ascertaining the voluntariness of an inculpatory statement." *Id.* ¶ 97.

¶ 27    Defendant does not contest the circuit court's factual findings at the suppression hearing. While defendant arrived at the station believing his visit was part of his job application, the detectives soon explained that they wanted to discuss Pena's death and issued *Miranda* warnings. They did not handcuff him. The detectives did not threaten him. They did not offer leniency in exchange for a confession, apart from stating it would help defendant's case if he demonstrated remorse and if the detectives could tell the prosecutors that defendant was being truthful. Moreover, defendant was 26 years old, had some college education, and the recording suggests that he was not confused. Defendant never invoked his right to an attorney or to remain silent. The interview lasted less than three hours. See *People v. Mandoline*, 2017 IL App (2d) 150511, ¶ 118 (explaining a four-hour interrogation was "relatively brief"). The record here supports the circuit

court's conclusion that defendant's will was not overborne, and his statements in the interview were voluntary. Thus, the circuit court did not err in denying the motion to suppress.

¶ 28    Defendant cites *People v. Leverson*, 2024 IL App (1st) 211083, ¶¶ 110-14, where the appellate court found that detectives violated a suspect's statutory right to call family and suppressed his confession as involuntary. There, the defendant specifically stated he wanted to call his mother so she could call a lawyer. *Id.* ¶ 59. Accordingly, the violation of his right to call family under Illinois law overlapped with his right to an attorney under *Miranda*. *Id.* ¶¶ 97-108. Ultimately, the appellate court found his statements were involuntary where, on top of the *Miranda* and § 103-3 violations, the suspect was 19 years old, had untreated mental health issues, and was subjected to a 72-hour interrogation process. *Id.* ¶¶ 94-95. *Leverson* did not suppress the suspect's statements solely because of violations of the Code of Criminal Procedure; they were a factor in the voluntariness calculation and coincided with *Miranda* violations.

¶ 29    Defendant notes that after one of his requests to call a family member, the detectives asked why, and defendant said it was because he was about "to tell [them] what happened in the – in the trailer." Defendant maintains that this was a request for an attorney. But the exclusionary rule under *Miranda* requires a suspect to "specifically invoke" his right to counsel. *People v. Tucker*, 2022 IL App (1st) 172982, ¶ 32. Defendant's request did not rise to an invocation of his right to counsel.

¶ 30                                    C. Recording Redaction

¶ 31    Defendant argues he received ineffective assistance of counsel because his attorney did not move to redact the detectives' statements in his electronically recorded interview as unfairly prejudicial where the detectives commented on defendant's credibility, intent, and the gruesome

nature of the crime. Defendant also contends counsel was ineffective for not requesting a limiting instruction related to the detectives' statements. The State argues a motion to redact was futile where the statements informed defendant's shifting narrative throughout the interview.

¶ 32    We review defendant's ineffective assistance of counsel claim *de novo. People v. Bates*, 2018 IL App (4th) 160255, ¶ 46. The United States and Illinois constitutions guarantee effective assistance of counsel for criminal defendants. U.S. Const., amends. VI, VIX; Ill. Const. 1970, art. I, § 8; see, *e.g.*, *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Moore*, 2020 IL 124538, ¶ 28. To sustain a claim of ineffective assistance, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). "A defendant must overcome the strong presumption that counsel's challenged action or inaction was the product of sound trial strategy." *People v. Webb*, 2023 IL 128957, ¶ 22.

¶ 33    Statements made by police officers questioning a defendant—including observations as to the defendant's guilt or credibility—are generally admissible "to demonstrate their effect on the defendant, to explain the defendant's response (or lack thereof), and to explain the course of the officers' interview/investigation." *People v. Davila*, 2022 IL App (1st) 190882, ¶ 51. The admissibility of such statements depends on a familiar Rule 403-type balancing test that one court has formulated as follows:

> "(1) whether the officer's questions or statements would be helpful to the jury so as to place the defendant's responses (or lack thereof) into context and (2) assuming the first criteria is satisfied, whether the prejudicial effect of the officer's questions or statements substantially outweighs their probative value." *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 48.

¶ 34    Defendant catalogues a series of statements from the detectives that he asserts were improper, but those statements provide the context for the various admissions defendant made in the course of the interrogation. In contrast to *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 37 where "the final two-thirds of the interview had no probative value" because the defendant was steadfast in his denial and "did not change his version of events throughout the interview," defendant did change his story—repeatedly. As a consequence, those prompts from the detectives had probative value. Further, unlike *People v. Davila*, 2022 IL App (1st) 190882, ¶ 58, the police commentary here did not falsely suggest the existence of other evidence against the defendant, it merely expressed skepticism of defendant's shifting accounts. "Each case involving a videotaped interrogation must be decided on its own facts while viewing the statements of both the police and the defendant in the context of the entire video and against the evidence offered at trial." *Id.* ¶ 53.

¶ 35    But we are not deciding an evidentiary question, *per se*, but answering a question one step removed: was defendant's counsel ineffective in failing to move to redact the detectives' statements? Or put differently, has defendant overcome the presumption that the challenged conduct of counsel was sound trial strategy rather than incompetence? *Webb*, 2023 IL 128957, ¶ 22. Defendant stood trial on two charges: first degree murder and felony murder based on armed robbery. In the interview with the detectives, defendant asserted that he acted in self-defense, which is a defense to first degree murder, but not felony murder. *People v. Lavelle*, 396 Ill. App. 3d 372, 381 (2009) ("Under normal circumstances, self-defense cannot be asserted as a defense to felony murder."). A common defense to felony murder is to deny that the defendant committed the predicate felony, but here defendant had *admitted* in the interview to robbing his victim. A plausible defense that defendant pursued at trial was to *deny* that he committed the robbery, to

walk back the admission, and to assert that he made the admission only to please his interrogators.

But that defense depended on the jury seeing full context of the interrogation, not some redacted,

sanitized version:

> "Q. Once you leave that trailer—Let me go back a second. [Doe,] did you ever take any money from Mr. Pena on that day in that trailer?
> A. No.
> Q. Well, you saw that video about the interrogation that you were under by those New Orleans – in New Orleans by those Chicago detectives. Why did you tell them that you took money if you didn't take money?
> A. I knew that's what they wanted me to say. I tried to call my mom and my sister to get some help, but they wouldn't—
> THE COURT: Answer the question that's asked of you. Ask another question.
> [DEFENSE COUNSEL]:
> Q. [Doe,] why did you tell them that you took money when you didn't?
> A. That was the only way I was going to get to call somebody."

In closing, counsel *used* the detectives' statements to argue that they fed defendant information to

induce him to admit to robbery:

> "[DEFENSE COUNSEL]: Did he tell those officers down in New Orleans what happened? There was a back-and-forth there. And you will make up your own mind about what was said, what to believe, what not to believe.
>     Those officers were looking to get certain things out, and feeding him certain things, and finding at the end of that interrogation—because that's what it was—to get him to say that he took money from Mr. Pena lying down on the ground."

And it worked. The jury acquitted defendant of felony murder, which necessarily means that the

jury found that defendant had *not* committed armed robbery. So the complained of conduct by

counsel in failing to seek a redaction looks very much like (successful) trial strategy.

¶ 36     But even if defendant could establish that counsel's performance fell below an objective

standard of reasonableness, he cannot establish prejudice (in either failing to seek redaction or a

limiting instruction). A defendant must " 'affirmatively prove' that prejudice resulted from

counsel's errors." *People v. Johnson*, 2021 IL 126291, ¶ 55 (quoting *Strickland*, 466 U.S. at 693).

"Where, as here, a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent counsel's errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* ¶ 54. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *Id.* "In weighing the impact of counsel's errors, the reviewing court should consider the totality of the evidence before the finder of fact." *People v. McCarter*, 385 Ill. App. 3d 919, 935-36 (2008).

¶ 37 Had the detectives' statements been redacted, the jury still would have heard each of defendant's admissions. Defendant admitted going to the trucking yard armed with a taser and planning to "confront" Pena about money defendant thought he was owed. When a detective asked him whether he knew there was going to be a confrontation and whether defendant in fact confronted Pena, defendant said yes. He admitted to inflicting the fatal injuries, first the stab wounds and then, after detectives told him Pena had other injuries, the hammer blows. He alternated between saying he struck Pena with the hammer so he could make it to the door and saying that he bludgeoned Pena because he "didn't want him to suffer." Once Pena was knocked down, defendant said he took the money from his pocket and left, concealing the hammer under the white bag and disposing of it in trash can on a nearby street. He then returned to his mother's house, showered, and after attempting to wash the blood out of them, disposed of his clothes. He later left the state.

¶ 38 But the evidence against defendant did not end with these admissions. Video surveillance showed him attempting to conceal his identity with a hood and mask and secreting himself along the perimeter of the trucking yard, where he testified he entered through a hole in the fence. Several photographs and the medical examiner's testimony showed the severity of Pena's injuries, which

were disproportionate to the wound to defendant's knee he testified he sustained during the struggle.

¶ 39    Defendant takes issue with detectives' statements about his credibility, his intent to rob Pena, and the gruesome nature of the crime. But there was already overwhelming evidence on each point. Defendant posits it is "likely that the jury's credibility determination was heavily influenced" where it "heard Doe referred to as a liar on over 40 occasions, and *** there were no other eyewitnesses to refute Doe's testimony." Defendant omits that when confronted with contrary evidence and detectives' doubts about his credibility, defendant changed his story more than ten times. And the prejudice prong requires a showing of "actual prejudice, not simply speculation that defendant may have been prejudiced." (Internal quotation marks omitted.) *Johnson*, 2021 IL 126291, ¶ 55. Regardless of the detectives' opinions about Doe's guilt and his intent, the record reflects that the jury formed its own opinion when it acquitted defendant of felony murder. The evidence against defendant left little room for reasonable doubt even if detectives' statements had been redacted from the interview, and whatever prejudice they presented does not suffice to undermine confidence in the jury's verdict. Indeed, in analyzing other claims for ineffective assistance of counsel that defendant raised before sentencing, the circuit court found that the trial record defeated any such claim:

> "In my opinion this was not a closely balanced case. This was a case where the evidence against you was ordinarily strong based on video, based on your flight, based on your out of court statement. And your testimony that you gave you had a full opportunity to testify in front of the jury. And obviously they chose to not accept it and returned a verdict that you were guilty of first degree murder in this particular case.
>     So I don't believe that you have established in anyway that your attorneys were ineffective during the course of this trial."

¶ 40    Defendant argues that even if counsel was not ineffective, admission of the detectives'

statements constituted plain error. Plain error permits review of forfeited errors "only if the error falls under the purview of one of two alternative prongs." *People v. Jackson*, 2022 IL 127256, ¶ 19. We may review "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from a clear or obvious error and not the evidence" or "when a clear or obvious error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Id.*

¶ 41    Defendant did not establish prejudice from the statements' admission, so his argument that the closely-balanced-evidence prong applies fails. See *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47 ("[W]here a defendant fails to show prejudice, a defendant's allegations of ineffective assistance of counsel and plain error under the closely-balanced-evidence prong both fail."). With respect to the second prong, such errors must "affect the framework within which the trial proceeds, rather than mere errors in the trial process itself." *People v. Moon*, 2022 IL 125959, ¶ 29. "An error that is amenable to harmless error analysis is not a structural error" subject to second-prong plain error review, *People v. Logan*, 2024 IL 129054, ¶ 80, and "[e]rroneous admission of evidence is subject to a harmless error analysis," *People v. Heineman*, 2023 IL 127854, ¶ 95; see *People v. Patterson*, 217 Ill. 2d 407, 424 (2005) (determining that admission of grand jury testimony in violation of the confrontation clause was "more accurately described as a trial error" rather than a structural defect in the trial (internal quotation marks omitted)); *People v. Temple*, 2014 IL App (1st) 111653, ¶ 51 (rejecting defendant's argument that admission of prior consistent statements or police officers' hearsay testimony constituted second-prong plain error). Defendant has failed to establish plain error under either prong.

¶ 42                    D. Serious Provocation Jury Instruction

¶ 43     Defendant argues his trial counsel was ineffective for failing to move for a jury instruction on serious provocation to reduce defendant's conviction to second degree murder where defendant testified that he experienced workplace harassment due to his sexuality and that Pena called him a "f****t" and an "abomination" inside the trailer. The State argues counsel's motion would have been futile where the statements at issue did not fall within any of the categories of serious provocation and the decision not to seek the instruction reflected sound trial strategy.

¶ 44     There are two potential mitigating factors under Illinois's second degree murder statute, and either can reduce first degree murder to second degree. 720 ILCS 5/9-2. The jury was instructed on the second, imperfect self-defense factor but not on serious provocation. Serious provocation applies where the defendant is "acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed ***." *Id.* § 9-2(a)(1). Illinois courts have recognized serious provocation in the following categories: "(1) substantial physical injury or assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the offender's spouse." *People v. Agee*, 2023 IL 128413, ¶ 81. "In deciding whether to give an instruction, the court must determine whether there is some evidence to support the theory offered by the instruction but should not weigh the evidence in making its determination." *People v. Sloan,* 2024 IL 129676, ¶ 15.

¶ 45     As provocation, defendant cites slurs he claims Pena uttered in the trailer. But "[w]ords, in and of themselves, no matter how vile," do not rise to serious provocation—to qualify, they must be accompanied by mutual combat. *People v. Garcia*, 165 Ill. 2d 409, 429-30 (1995). Defendant does not argue mutual combat, and this claim fails as a result.

¶ 46    In arguing to the contrary, defendant relies on *People v. Newberry*, a case readily distinguished. 127 Ill. App. 2d 322, 327 (1970). There, the defendant appealed a manslaughter conviction and argued that the trial evidence supported either that he was guilty of murder or the homicide was accidental. *Id*. After attempting to reconcile with a former romantic partner, defendant shot her in the head when she responded derisively to his threat of suicide. *Id*. The appellate court affirmed the manslaughter conviction because "[t]he trier of fact could reasonably have found from this evidence that defendant, already in a depressed emotional state and having contemplated committing suicide, became so aroused and impassioned by the deceased's attitude and by the nature of her reply to his request, that he immediately drew the gun from his pocket and shot her in the head." *Id.* To the extent that defendant argues that words alone are enough to warrant a serious provocation instruction based on *Newberry*, that holding has no continued viability after the Illinois Supreme Court has held otherwise. See, *e.g.*, *People v. Chevalier*, 131 Ill. 2d 66, 71-72, 75-76 (1989) (explaining that "[t]he rule that mere words are insufficient provocation applies no matter how aggravated, abusive, opprobrious or indecent the language" and overruling a line of cases "recogniz[ing] an exception to the general rule that a verbal communication of adultery is insufficient provocation").

¶ 47    Finally, defense counsel presented a defense of self-defense and, alternatively, an unreasonable belief in the need for self-defense, which found some support in defendant's recorded interview. Asserting an additional defense of serious provocation would be in tension because self-defense is predicated on a defendant's reasonable belief as to necessity and justification, and serious provocation is based on sudden and intense passion—an emotionally overwhelmed reaction. Against this backdrop, it was a perfectly reasonable trial strategy to pursue only self-

defense.

¶ 48                                    E. Sentence

¶ 49    Defendant argues that his 45-year sentence is excessive given his remorse, work ethic, lack

of violent criminal history, and that he feared for his life when he committed the offense. We

review the sentence for abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000).

¶ 50    The Illinois Constitution provides that criminal penalties are determined by "the

seriousness of the offense and with the objective of restoring the offender to useful citizenship."

Ill. Const. 1970, art. I, § 11; *People v. Perruquet*, 68 Ill. 2d 149, 154-55 (1977). Circuit courts must

balance the interests of retribution with rehabilitation. *People v. Quintana*, 332 Ill. App. 3d 96,

109 (2002). This process requires "careful consideration of all factors in aggravation and

mitigation." *Id*. "The reviewing court should not substitute its judgment for that of the [circuit]

court simply because it would have balanced the appropriate sentencing factors differently."

*People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. Rather, the circuit court's decision is afforded

"great deference" because it "observed the defendant and the proceedings [and] has a far better

opportunity to consider these factors than the reviewing court, which must rely on the cold record."

(Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010).

¶ 51    Here, the circuit court expressly considered defendant's remorse, work ethic, community

involvement, and lack of violent criminal history. The circuit court also articulated the seriousness

of the crime and why defendant's self-defense testimony was not credible:

> "[Doe] is a very unusual defendant. To be convicted of such a horrific crime,
> something that was so violent, something that does not seem in anyway to be in anyway
> predictable. I think he was sincere when he addressed you in his statement. I do think he
> lives with this not in as much as you[,] but I know he lives with this and this is a pain that
> he and his family are going to have to live with because there are consequences to the
> actions that he committed. ***. [I]t's a very difficult process trying to formulate what is a

fair and appropriate sentence[] in a situation like this because the crime is so horrible as I mentioned.

Here is a man that gets stabbed 17 times who has a hole hammered into his head and gets killed by the defendant. The motivation appears to have resulted from just a dispute between an employer and employee[,] and that is so out of proportion to the dispute[,] which was over relatively a small amount of money in the grand scheme of things.

\*\*\*

To family members heartbreaking sort of information that I learned today about how he had helped take care of his sister who was apparently a tragic victim of some type of horrific crime herself[,] which caused her to be paralyzed.

He has been a person who has used his time wisely while incarcerated at the Cook County Department of Corrections. Engaging in multiple programs here for his own benefit or for the benefit of other inmates who may not have the same educational background that he has or the same intelligence level that he has.

\*\*\*

I don't believe [defendant] has any other prior criminal behavior. This was something that is unexplainable, inexplicable, and just ultimately I find it hard to believe that he is here convicted of such a serious offense. \*\*\*.

I don't believe the jury believed and certainly didn't believe myself after hearing him testify that he parked his car outside that lot where he had always otherwise parked his car and then came into a hole in the fence as opposed to driving like anybody else would. Getting out of his car in view of other people in the lot. A story that somehow a pothole in the lot might affect the tire on his car to explain this otherwise very sort of suspicious behavior prior to Mr. Pena being subject of the attack demonstrates to me I believe that there was a plan in place by [defendant] for whatever emotions he was going through at that time to get even with Mr. Pena because of the fact that [he] had lost out on some salary that he believed he was entitled to and maybe he was.

But there is something I found trouble—some things I found troubling about his testimony and I did not believe. I did not believe he was going through some sort of employment agency and filing a complaint against Mr. Pena and that was the somehow that statement triggered Mr. Pena to flying off the handle and attacking him. I didn't believe that. Obviously, the jury did not either. It was not credible testimony.

I also don't believe that Mr. Pena made some sort of a remark about the defendant's sexuality as he testified to. That he belittled and berated him for that. Obviously, I don't think the jury believed that either, but I didn't find that to be credible testimony at all.

The defendant went into that trailer where Mr. Pena was and only the defendant walked out. I mean he walked out. Mr. Pena had 17 stab wounds and a hole in his head. Hard to explain what some demons possessed [defendant] that particular date."

Thus, the circuit court accounted for nearly all the mitigating factors that defendant cites in support of a reduced sentence. As noted, we cannot reverse a sentence "simply because [we] would have balanced the appropriate sentencing factors differently." *Sauseda*, 2016 IL App (1st) 140134, ¶ 19. Moreover, the "most important factor to consider is the seriousness of the crime," *People v. Williams*, 2017 IL App (1st) 150795, ¶ 44, and the circuit court meticulously examined that factor.

¶ 52    To the extent there was no direct analysis of defendant's rehabilitative potential, a circuit court "is not required to detail precisely for the record the exact process by which it determined the penalty, nor is it required to articulate consideration of mitigating factors." *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51. "Absent some affirmative indication to the contrary, other than the sentence itself, we presume the [circuit] court considered all mitigating evidence before it." *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 67. Defendant did not present any evidence that the circuit court failed to contemplate rehabilitation. Thus, we presume the circuit court considered it.

¶ 53    At bottom, the sentence was within the statutory range of 20 years to natural life imprisonment. 730 ILCS 5/5-8-1(a)(1)(b) (West 2016); 730 ILCS 5/5-4.5-20(a) (West 2016); *People v. Aguado*, 2024 IL App (1st) 220615-U, ¶ 26. A sentence within the statutory limit is excessive if it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. Given the seriousness of the crime, the 45-year sentence was not excessive.

¶ 54                                    III. CONCLUSION

¶ 55    Defendant's conviction and sentence are affirmed.

¶ 56    Affirmed.

---

*People v. John Doe*, **2026 IL App (1st) 240300**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18 CR 6009201; the Hon. James M. Obbish, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, State Appellate Defender (Douglas R. Hoff, Deputy Defender, Hayley D. Yussman, Assistant Appellate Defender), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney of Cook County (John E. Nowak, Paul E. Wojcicki, Amy McGowan, Assistant State's Attorneys), for the People. |